Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/25/2024 09:06 AM CDT

State ex rel. Gregory Spung et al., relators,
v. Robert Evnen, Nebraska Secretary of
State et al., respondents.

___ N.W.3d ___

Filed October 16, 2024.    No. S-24-563.

1. **Mandamus: Words and Phrases.** Mandamus is an extraordinary remedy, not a writ of right, issued to compel the performance of a purely ministerial act or duty, imposed by law upon an inferior tribunal, corporation, board, or person where (1) the relator has a clear right to the relief sought, (2) there is a corresponding clear duty existing on the part of the respondent to perform the act, and (3) there is no other plain and adequate remedy in the course of the law.
2. **Mandamus: Proof.** In a mandamus action, the party seeking mandamus has the burden of proof and must show clearly and conclusively that such party is entitled to the particular thing the relator asks and that the respondent is legally obligated to act.

Original action. Peremptory writ issued.

Rose Godinez, Jane Seu, Grant Friedman, and Dylan Severino, of ACLU of Nebraska Foundation, Jeffrey P. Justman, Craig Coleman, Martin S. Chester, Anderson C. Tuggle, and Joe Quinn, of Faegre, Drinker, Biddle & Reath, L.L.P., pro hac vice, and Jonathan Topaz and Sophia Lin Lakin, of American Civil Liberties Union Foundation, pro hac vice, for relators.

Michael T. Hilgers, Attorney General, Eric J. Hamilton, Lincoln J. Korell, and Zachary B. Pohlman, for respondent Robert Evnen.

Christopher L. Eickholt, of Eickholt Law, L.L.C., for amicus curiae Nebraska Criminal Defense Attorneys Association.

John D. Cartier, of Cartier Law, L.L.C., for amicus curiae American Probation and Parole Association.

Nicholas Grandgenett and Robert E. McEwen, for amicus curiae Nebraska Appleseed Center for Law in the Public Interest, and Graham Provost, pro hac vice, for amicus curiae Public Rights Project.

Brenna M. Grasz, of Keating, O'Gara, Nedved & Peter, P.C., L.L.O., and Douglas P. Seaton, James V. F. Dickey, and Alexandra K. Howell, of Upper Midwest Law Center, for amici curiae Governor Jim Pillen et al.

Hallie A. Hamilton, of Abrahams, Kaslow & Cassman, L.L.P., for amicus curiae Kristin Skorupa.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

PER CURIAM.

The Nebraska Secretary of State (Secretary) announced in the summer of 2024 that he would not implement recent statutory amendments providing that individuals who have been convicted of felonies are eligible to vote as soon as they complete their sentences. The Secretary took the position that the statutory amendments were unconstitutional. Individuals who were convicted of felonies and who had completed their sentences responded by filing this action in which they seek a writ of mandamus directing the Secretary and two named county election commissioners to implement the 2024 amendments and allow them to register to vote. Because the requisite number of judges have not found that the statutory amendments are unconstitutional, we issue a peremptory writ of mandamus directing the Secretary and the election commissioners to implement the statutory amendments immediately.

## BACKGROUND

In order to properly understand the parties' dispute, familiarity with provisions of the Nebraska Constitution regarding voting rights, Nebraska's Board of Pardons, and the separation of powers is required. Accordingly, we begin there.

*Constitutional Provisions.*

The Nebraska Constitution divides the powers of state government "into three distinct departments, the legislative, executive, and judicial." Neb. Const. art. II, § 1. It also states that "no person or collection of persons being one of these departments shall exercise any power properly belonging to either of the others except as expressly directed or permitted in this Constitution." *Id.* This separation of powers provision has been a part of the Nebraska Constitution since 1875.

Provisions governing voting rights and elections have also been part of the Nebraska Constitution since 1875. The constitution provides that "[a]ll elections shall be free; and there shall be no hindrance or impediment to the right of a qualified voter to exercise the elective franchise." Neb. Const. art. I, § 22. Qualified voters are defined in article VI, § 1, of the constitution to mean "[e]very citizen of the United States who has attained the age of eighteen years . . . and has resided within the state and the county . . . for the terms provided by law . . . except as provided in section 2 of this article . . . ." Article VI, § 2, identifies voters who are disqualified from voting. It provides, "No person shall be qualified to vote who is non compos mentis, or who has been convicted of treason or felony under the laws of the state or of the United States, unless restored to civil rights." Neb. Const. art. VI, § 2.

Also relevant to this case is the provision of the Nebraska Constitution that authorizes the granting of pardons and other forms of clemency. The 1875 constitution authorized the Governor to "grant reprieves, commutations and pardons after conviction, for all offenses, except treason and cases of impeachment, upon such conditions and with such restrictions and limitations as he may think proper, subject to such

regulations as may be provided by law relative to the manner of applying for pardons." Neb. Const. art. V, § 13 (1875). That provision was amended in 1920 to transfer clemency powers from the Governor to a pardons board comprised of the Governor, the Attorney General, and the Secretary. See Neb. Const. art. IV, § 13 (1920). Currently, article IV, § 13, of the constitution addresses the pardon power and provides in relevant part: "The Governor, Attorney General and Secretary of State, sitting as a board, shall have power to remit fines and forfeitures and to grant respites, reprieves, pardons, or commutations in all cases of conviction for offenses against the laws of the state, except treason and cases of impeachment."

*Statutory Enactments.*

Also relevant to this case are current and former statutes concerning the voting rights of individuals convicted of felonies and how those rights can be restored. Before ratification of the 1875 constitution, an 1873 statute prohibited any person "sentenced to be punished for any felony (when sentence shall not have been reversed or annulled)" from voting, serving on a jury, or holding office, "unless said convict shall receive from the governor of this state a general pardon . . . in which case said convict shall be restored to his civil rights and privileges." Gen. Stat. ch. 58, § 258, p. 783 (1873). Later, after the creation of the Board of Pardons, see Neb. Const. art. IV, § 13 (1920), the Legislature amended this statute to provide that any "general pardon" restoring such rights must come from the Board of Pardons. 1951 Neb. Laws, ch. 86, § 1, p. 249. Eventually codified as Neb. Rev. Stat. § 29-112 (Cum. Supp. 1951), this statute remains part of Nebraska's criminal procedure statutes today. See § 29-112 (Reissue 2016).

In 1959, the Legislature amended § 29-112 to eliminate the language requiring a "general pardon" and to substitute in its place the requirement that a "warrant of discharge" from the Board of Pardons was the mechanism to restore a felon's civil rights and privileges. 1959 Neb. Laws, ch. 117, §§ 1

and 2, pp. 448-49 (codified as § 29-112 (Cum. Supp. 1959)). As amended in 1959, § 29-112 provided that felons whose sentences had not been reversed or annulled were "deemed incompetent to be an elector . . . unless such convict shall receive from the Board of Pardons of this state a warrant of discharge, in which case such convict shall be restored to his civil rights and privileges." § 29-112 (Reissue 1964).

In 2001, the Nebraska Attorney General issued an advisory opinion concluding that "the Board of Pardons is not required to issue a warrant of discharge" and that "restoration of any civil rights which are forfeited by an offender upon conviction of a felony is a matter within the discretion of the Board of Pardons." Att'y Gen. Op. No. 01101 (Mar. 23, 2001). The Attorney General reasoned that although the Legislature "purport[ed] to mandate the issuance of such warrants of discharge by the Board" when it amended § 29-112 in 1959, the clemency power belonged exclusively to the Board of Pardons and thus "the Legislature may not mandate that the Board of Pardons exercise that power." Att'y Gen. Op. No. 01101, *supra*.

In 2002, the Legislature amended the warrant of discharge provisions in § 29-112. See Neb. Laws 2002, L.B. 1054, § 3. As amended by L.B. 1054, § 29-112 provided that a warrant of discharge issued by the Board of Pardons had the effect of restoring "such civil rights and privileges as enumerated or limited by the Board of Pardons." § 29-112 (Cum. Supp. 2002).

In 2005, the Legislature again amended § 29-112 when it enacted 2005 Neb. Laws, L.B. 53, over a gubernatorial veto. See 2005 Neb. Laws, L.B. 53, § 1. As amended by L.B. 53, § 29-112 no longer required a warrant of discharge from the Board of Pardons to restore voting rights and, instead, provided: "Any person sentenced to be punished for any felony, when the sentence is not reversed or annulled, is not qualified to vote until two years after he or she has completed the sentence, including any parole term. The disqualification

is automatically removed at such time." § 29-112 (Cum. Supp. 2006).

In 2017, the Legislature passed a bill that would have removed L.B. 53's 2-year waiting period, but that legislation was vetoed. 2017 Neb. Laws, L.B. 75, § 1. See, also, Legislative Journal, 105th Leg., 1st Sess. 1271-73 (Apr. 27, 2017).

Then, in 2024, the Legislature passed L.B. 20, which again amended § 29-112. See 2024 Neb. Laws, L.B. 20, § 1. As amended by L.B. 20, § 29-112 now provides: "Any person sentenced to be punished for any felony, when the sentence is not reversed or annulled, is not qualified to vote until such person has completed the sentence, including any parole term. The disqualification is automatically removed at such time."

Several other election statutes were also amended by L.B. 20, including those governing the voter registration process and related forms and notices. See L.B. 20, §§ 4 and 5 (amending Neb. Rev. Stat. §§ 32-312 (Cum. Supp. 2022) and 32-313 (Reissue 2016)). Governor Jim Pillen declined to sign L.B. 20 but allowed it to become law without his signature. See Legislative Journal, 108th Leg., 2d Sess. 1804-05 (Apr. 17, 2024).

With this statutory history established, we turn to the events that immediately preceded this mandamus action.

*Attorney General's Opinion and Secretary's Announcement.*

Two days before L.B. 20 became effective, the Attorney General released an advisory opinion in response to a request from the Secretary. The opinion, as summarized, concluded that L.B. 20 and L.B. 53 violated the Nebraska Constitution because the constitution vests the power to restore a felon's right to vote in the Board of Pardons, not the Legislature. See Att'y Gen. Op. No. 24-004 (July 17, 2024).

The same day that the Attorney General released his opinion, the Secretary announced that he was "directing county election offices to stop registering individuals convicted of

felonies who have not been pardoned by the Nebraska Board of Pardons." The Secretary informed county election officials that "we will not be implementing LB20 and will no longer register individuals convicted of felonies under the laws of Nebraska unless their voting rights have been restored by the Board of Pardons." The Secretary also directed county election officials to use voter registration forms that used language required by statutes in existence prior to the passage of L.B. 53 in 2005 and that lacked language expressly required by L.B. 20.

*Relators Commence This Action.*

In response to the Secretary's announcement, three individuals and Civic Nebraska, a nonprofit corporation, asked to commence an original action for a writ of mandamus in this court with the Secretary and two county election commissioners as respondents. The relators asked for a writ of mandamus compelling the respondents to use voter registration applications required by L.B. 20. See § 32-312. They also asked for a writ of mandamus requiring the Secretary to "effectuate the automatic removal of disqualification of eligibility" for the individual relators. Finally, the relators asked for a writ of mandamus requiring the election commissioners to register the individual relators as qualified voters.

We granted leave to file the original action and issued an alternative writ of mandamus that ordered the Secretary to show cause as to why a peremptory writ of mandamus should not issue. The Secretary filed a response to the alternative writ in which he asserted that because L.B. 20 and L.B. 53 are unconstitutional, the relief sought by the relators would require him to perform an illegal act.

After receiving the Secretary's response, we directed the parties to stipulate to facts that would allow us to resolve this matter. The parties did so. Among the facts to which the parties stipulated were details concerning the relators. One relator, Gregory Spung, was previously convicted of a felony under Nebraska law and has completed his sentence

for that conviction. Another relator, Jeremy Jonak, was previously convicted of a felony under Nebraska law, as well as a felony under federal law. He too has completed his sentences for both convictions. Neither Spung nor Jonak has received a pardon from the Board of Pardons. A third individual relator voluntarily dismissed his claims after the stipulated facts were filed. With respect to Civic Nebraska, the parties stipulated only as to its status as a Nebraska nonprofit corporation and its office location.

After the parties filed their joint stipulated facts, we ordered expedited briefing and oral argument. We also granted leave for several individuals and entities to submit briefs as amici curiae.

## MANDAMUS PRINCIPLES

[1,2] As we have noted, this is an action for a writ of mandamus. Mandamus is an extraordinary remedy, not a writ of right, issued to compel the performance of a purely ministerial act or duty, imposed by law upon an inferior tribunal, corporation, board, or person where (1) the relator has a clear right to the relief sought, (2) there is a corresponding clear duty existing on the part of the respondent to perform the act, and (3) there is no other plain and adequate remedy in the course of the law. *Cain v. Lymber*, 306 Neb. 820, 947 N.W.2d 541 (2020). In a mandamus action, the party seeking mandamus has the burden of proof and must show clearly and conclusively that such party is entitled to the particular thing the relator asks and that the respondent is legally obligated to act. *State ex rel. Parks v. City of Omaha*, 277 Neb. 919, 766 N.W.2d 134 (2009). Whether to grant a writ of mandamus is within the court's discretion. See *State ex rel. Veskrna v. Steel*, 296 Neb. 581, 894 N.W.2d 788 (2017).

## PARTIES' ARGUMENTS

The relators ask us to issue a writ directing the Secretary and the election commissioners to implement the reenfranchisement provisions of L.B. 20. They claim L.B. 20 grants

individuals convicted of felonies who have completed their sentences a clear right to register to vote and, correspondingly, imposes a clear duty on the Secretary and election commissioners to permit such individuals to register through voter registration forms required by the statute. They also argue that because the 2024 general election will occur in a matter of weeks, they have no other adequate remedy at law.

While the relators' argument for mandamus depends on the reenfranchisement provisions of L.B. 20, the respondents' argument against mandamus depends upon the Nebraska Constitution. (Only the Secretary has submitted a brief arguing that the reenfranchisement provisions of L.B. 20 are unconstitutional, but we understand the election commissioners to take the same position and thus refer to the respondents collectively.) The respondents argue that because the reenfranchisement provisions of L.B. 20 are unconstitutional, not only is there no clear duty for them to implement the statutes, but it would violate the law for them to do so.

The relators offer two responses to the respondents' claim of unconstitutionality. They argue first that the respondents should not be allowed, in this mandamus action, to claim that statutes are unconstitutional. Alternatively, they argue that a writ of mandamus should issue because the reenfranchisement provisions of L.B. 20 are constitutional.

## STANDARD OF REVIEW

Unlike most of our cases, this action began in our court, so in one sense, there is no decision for us to review. We recognize, however, that in another sense, the Secretary is asking us to assess his determination that the reenfranchisement provisions of L.B. 20 are unconstitutional. When we are asked to review a lower court's determination of a statute's constitutionality, we resolve the matter independently of the lower court's determination because it presents a question of law. See *Big John's Billiards v. State*, 288 Neb. 938, 852 N.W.2d 727 (2014). So too here, to the extent that we must determine

whether the reenfranchisement provisions of L.B. 20 are constitutional, we do so independently of any determination by the Secretary or the Attorney General.

## JUSTICIABILITY

Before addressing the merits of the petition for a writ of mandamus, we briefly address an issue regarding justiciability. The respondents argue that Civic Nebraska's claims for mandamus should be dismissed. They point out that the parties' joint stipulated facts establish standing for the individual relators, Spung and Jonak, but that the parties did not stipulate to facts that would establish standing for Civic Nebraska.

We need not, however, determine whether Civic Nebraska has standing to reach the issues presented in this mandamus action. Under the parties' stipulated facts, Spung and Jonak clearly have standing to seek mandamus. We will thus reach the arguments for mandamus presented by the individual relators. See *Planned Parenthood of the Heartland v. Hilgers, ante* p. 217, 9 N.W.3d 604 (2024) (declining to review district court's determination that one plaintiff in declaratory judgment action lacked standing because another plaintiff had standing). See, also, *Bowsher v. Synar*, 478 U.S. 714, 106 S. Ct. 3181, 92 L. Ed. 2d 583 (1986) (declining to consider standing of all plaintiffs because one party had standing).

## MANDAMUS ANALYSIS

As we have discussed, the respondents' defense in this action rests on their position that the reenfranchisement provisions of L.B. 20 are unconstitutional. As with any claim that a statute is unconstitutional in this court, the respondents' defense implicates article V, § 2, of the Nebraska Constitution, which provides in part: "No legislative act shall be held unconstitutional except by the concurrence of five judges." In this case, as demonstrated in more detail in the separate opinions that follow, fewer than five judges find that the reenfranchisement provisions of L.B. 20 are unconstitutional.

Accordingly, the respondents have not established that the reenfranchisement provisions of L.B. 20 are unconstitutional.

The Secretary's sole defense in this mandamus proceeding was that the reenfranchisement provisions of L.B. 20 are unconstitutional. Because the Secretary was unable to establish his defense that the statutes were unconstitutional, a majority of this court agrees that the relators have established the prerequisites for mandamus relief under provisions of L.B. 20 and that the writ should issue. As to their request that the respondents use voter registration application forms required by L.B. 20, they have shown a clear right to the relief sought and a clear duty on the part of the respondents to comply. Given that the registration deadlines for voting in the 2024 general election are fast approaching, they have also shown they have no other plain and adequate remedy available in the ordinary course of the law. The respondents are ordered to use voter registration application forms required by L.B. 20.

For essentially the same reasons, the relators have shown they are entitled to mandamus relief ordering the election commissioners to register the individual relators to vote upon the receipt of a complete and correct registration application. The election commissioners are ordered to do so.

The relators also request that we order the Secretary to "effectuate the automatic removal of disqualification of eligibility." They contend that under § 32-313, the Secretary has a duty to effectuate the removal of their disqualification from voting. The Secretary, however, argues that § 32-313 does not impose a duty upon him. The Secretary points out that the statute provides that the disqualification is "automatically removed."

To the extent the relators are contending that § 32-313 requires the Secretary to take some affirmative act to remove the disqualification of individuals convicted of a felony as soon as they complete their sentence, we disagree and will not order him to do so. To the extent the relators are asking that we order the Secretary to rescind any direction to election

commissioners that would preclude the registration of the relators based on conditions outside of L.B. 20, we find they have established a basis for mandamus relief. The Secretary is ordered to remove any disqualification on registration he has imposed that is not contained within L.B. 20 and to comply in all respects with the provisions of L.B. 20.

## CONCLUSION

For the reasons we have stated, we issue the peremptory writ directing the respondents to immediately comply with L.B. 20 as described in this opinion.

PEREMPTORY WRIT ISSUED.

HEAVICAN, C.J. concurring.

I concur with the per curiam opinion's analysis of mandamus, but I write separately to say we should not reach the merits in this case. In *State v. Douglas County*, 18 Neb. 506, 26 N.W. 315 (1886) (*Lytle*), the relator filed an original action in this court seeking a writ of mandamus that would compel the county commissioners of Douglas County to call for the election of 12 justices of the peace for the city of Omaha. The relator contended that a statute that had reduced the number of justices of the peace for the city to three was unconstitutional. This court acknowledged the issue was "very important," but declined to reach the constitutional question. *Id*. at 507, 26 N.W. at 315. It explained that such a question "should not be decided without a full hearing of all parties interested, and a careful examination of the entire subject." *Id*. "Less than this," the court continued, "would not justify the court, in a case of this importance, in rendering a decision." *Id*. But, the court explained, the circumstances under which the case arrived did not allow for the necessary consideration of the issues.

As the court described the situation:

[O]n the eve of an election, with many other important cases pressing on our attention, this case was submitted, practically without argument, and we are asked to

> determine whether or not the act reducing the number of justices in Omaha to three is constitutional. We cannot dispose of the case in this summary manner.

*Id*. Under the circumstances, the court concluded that "[t]he presumption is that the legislature has done its duty and that an act passed by it is not in conflict with the constitution; and it is the duty of all ministerial officers to obey it until the act is declared invalid." *Lytle*, 18 Neb. at 508, 26 N.W. at 316.

There are without question some differences between the situation presented in *Lytle* and the situation presented in this case. The original action in *Lytle* was filed just days before the scheduled election. In this case, the Nebraska Secretary of State (Secretary) announced he would not implement the reenfranchisement provisions of 2024 Neb. Laws, L.B. 20, on July 19, 2024, and the original action was commenced on July 29, more than 3 months before the election. In *Lytle*, the case was submitted "practically without argument." 18 Neb. at 507, 26 N.W. at 315. In this case, we received detailed briefing from the relators, the Secretary, and amici curiae, and oral argument was held. In *Lytle*, the relators argued in favor of unconstitutionality. Here, it is the respondents.

All that said, having now considered the arguments of the parties, I see similarities between this case and *Lytle*. Although in this case the relators and the Secretary submitted briefs, they were forced to do so on a very compressed timeline. The relators' opening brief was filed less than a week after the parties stipulated to facts. The Secretary's brief was filed 4 days later, with the relators' reply filed 3 days after that. The relators thus had only 3 days to file a brief responding to the Secretary's arguments regarding the unconstitutionality of the reenfranchisement provisions of L.B. 20. Oral argument was heard 2 days later, on August 28, 2024.

Even under this expedited timeframe, there was relatively little time between the submission of the case to this court and the onset of deadlines related to the 2024 general election. Early voting in Nebraska commenced on October 7. The

deadline by which individuals can register to vote online or by mail is October 18. The deadline by which individuals can register in person is October 25. And, finally, the election is November 5.

Further complicating matters is the nature of this case. As we have discussed, this case turns on the meaning of several provisions of our state constitution. This court has said that the "main inquiry" in construing the state constitution is the "intent and understanding of its framers and the people who adopted it." *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 340, 37 N.W.2d 502, 507 (1949). That task is often more difficult the older the provisions at issue, and many of the provisions at issue here were enacted as early as 1875. Further complicating matters, the minutes from the 1875 constitutional convention appear to have been lost. See Addison E. Sheldon, Official Report of the Debates and Proceedings in the Nebraska Constitutional Convention at 10 (1906). See, also, *State ex rel. Johnson v Chase*, 147 Neb. 758, 25 N.W.2d 1 (1946) (noting that proceedings of 1875 constitutional convention were destroyed by fire). With little direct evidence as to the original understanding of the Nebraska Constitution, it is necessary to consider extrajurisdictional authority.

Also relevant to the constitutional analysis are various statutes passed over the last 150 years regarding the restoration of voting rights of those convicted of felonies. We have recently noted that longstanding practices of government can inform whether a statute is consistent with the constitution. See *State v. Gnewuch*, 316 Neb. 47, 3 N.W.3d 295 (2024). As otherwise noted, however, that over time, the Legislature has enacted a number of different methods of restoring civil rights, and both the relators and the Secretary contend that this statutory history supports their respective positions.

Finally, the Secretary is arguing in this case that a statute is unconstitutional. In an opinion we issued just a few months ago, *Planned Parenthood of the Heartland v. Hilgers, ante*

p. 217, 9 N.W.3d 604 (2024), we quoted extensively from Thomas M. Cooley's treatise on constitutional law regarding a court's duties when asked to pass upon the constitutionality of a statute. Relevant to the current discussion, we quoted the following excerpt from Cooley's treatise:

> "[W]hen courts are called upon to pronounce the invalidity of an act of legislation, passed with all the forms and ceremonies requisite to give it the force of law, they will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light upon the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt."

*Id.* at 227, 9 N.W.3d at 611 (quoting Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union (1868)). As the excerpt illustrates, caution, patience, and deliberation are to characterize courts' consideration of the constitutionality of statutes.

From the time this action was commenced, through oral argument, and up until the release of a decision, this court has devoted significant time and attention to the difficult issues raised by this case. Having done so, however, I have the same concerns that animated our decision in *Lytle*. We recognize the importance of the issue this case presents, but under the circumstances, I am not confident that we have given, or were able to give, this important issue the attention and consideration it deserves in advance of the deadlines for voter registration. Similar concerns in *Lytle* prompted us to decline to reach the constitutional question there and to instead rely upon the presumption that statutes are constitutional. I believe it appropriate to follow that same course here. As my colleagues' writings indicate, this matter does not present "[a] clear case[] of unconstitutionality." See *Van Horn v. State*, 46 Neb. 62, 83, 64 N.W. 365, 372 (1895).

Because I decline to reach the Secretary's claim that the reenfranchisement provisions of L.B. 20 are unconstitutional, on this record, the relators have established the prerequisites for mandamus relief. They have shown a clear right to the relief sought and a clear duty on the part of the respondents to comply with and implement the provisions of L.B. 20. Given that the registration deadlines for voting in the 2024 general election are fast approaching, the relators have also shown they have no other plain and adequate remedy available in the ordinary course of law. I would find that mandamus relief is appropriate in this case.

CASSEL, J., concurring.

To paraphrase Mark Twain: Justice Miller-Lerman's fears of an outbreak of statutory defiance among Nebraska's ministerial officers seem greatly exaggerated. The supermajority requirement and the presumption of constitutionality impose a high burden upon a challenger, which should discourage any executive officer, in all but the clearest circumstances, from unilaterally refusing to fulfill a statutory mandate.

The outcome of this case flows from the history surrounding the 1875 Nebraska Constitution. The parties, on both sides, paid little attention to that history. The 1875 statute cited in the separate opinions of several of my colleagues persuades me that at the time of adoption of the 1875 and 1920 constitutional provisions,[1] the Legislature retained a role in restoration of civil rights.

Because the parties agree that the two persons having unpardoned felony convictions before us in this case have completed their sentences, I cannot say that the respondent Secretary of State has met the high burden here. Thus, I concur in the judgment.

---

[1] See, Neb. Const. art. VII, § 2 (1875); Neb. Const. art. VI, § 2 (1920).

But I caution that any attempt by the Legislature to restore rights at some earlier time is likely to collide directly with the pardon power conferred upon the Board of Pardons.[2]

_____
[2] See Neb. Const. art. IV, § 13.

STACY, J., concurring.

I concur with the per curiam opinion and agree this court must issue a peremptory writ of mandamus directing the respondents to comply in all respects with the provisions of 2024 Neb. Laws, L.B. 20. The respondents' only defense in this mandamus action was their assertion that L.B. 20 is unconstitutional. For reasons explained in separate concurrences, some members of this court conclude it is not appropriate to reach the constitutional challenge in this mandamus action. For reasons I will explain in this concurrence, I agree with my dissenting colleagues that we should reach the constitutional challenge to L.B. 20 in this mandamus action, but like several of my concurring colleagues, I conclude the respondents have failed to clearly establish that the reenfranchisement provisions of L.B. 20 are unconstitutional.

CONSIDERATION OF
CONSTITUTIONAL CHALLENGE

The lead dissent concludes that under this court's 1895 decision in *Van Horn v. State*,[1] the respondents should be permitted to raise a claim of unconstitutionality as a defense to mandamus. I generally agree that because *Van Horn* has been distinguished but not overruled, the respondents should be permitted to rely on the narrow holding of that case to challenge the constitutionality of the reenfranchisement provisions in L.B. 20 in this mandamus action. That said, I think this court should revisit the *Van Horn* rule, especially now that the Legislature has repealed Neb. Rev. Stat. § 84-215 (Reissue 2014) and the Nebraska Attorney General no longer

_____
[1] *Van Horn v. State*, 46 Neb. 62, 64 N.W. 365 (1895).

has a statutory duty to file an action seeking judicial determination of a statute's constitutionality when a government official refuses to implement the statute in reliance on an Attorney General's opinion.[2]

In *Van Horn*, the government officials who refused to implement the act also asked the county attorney to take appropriate steps to have the constitutionality of the act determined in the courts; the county attorney then filed the mandamus action we considered in *Van Horn*. As the law in Nebraska currently stands, *Van Horn* authorizes government officials to refuse to implement an act of the Legislature based on a good faith belief that the act is unconstitutional, but it is unclear whether *Van Horn* imposed a corresponding obligation to see to it that an action is commenced in a court of competent jurisdiction to obtain a judicial determination of constitutionality. Because only the judicial branch has the authority to declare an act unconstitutional,[3] and because there is no longer a statute directing the Attorney General to present constitutional disputes like this one to the courts for resolution, I think the *Van Horn* rule has become untenable. I am concerned it will delay, rather than facilitate, prompt judicial resolution of constitutional challenges to statutes, and I think we should either prospectively disapprove of the *Van Horn* rule, or expressly recognize a corresponding obligation to promptly commence an action to obtain a judicial determination of constitutionality.

I also agree with my dissenting colleagues that our 2002 decision in *Ways v. Shively*[4] neither addressed nor resolved the specific separation of powers question before us now. It is true that in *Ways*, the Attorney General argued in an amicus brief that only Nebraska's Board of Pardons could restore

---

[2] But see Neb. Rev. Stat. § 84-731 (Reissue 2014).

[3] E.g., *Planned Parenthood of the Heartland v. Hilgers, ante* p. 217, 9 N.W.3d 604 (2024).

[4] *Ways v. Shively*, 264 Neb. 250, 646 N.W.2d 621 (2002).

civil rights and that therefore, Neb. Rev. Stat. § 83-1,118(5) (Reissue 1999) violated the separation of powers because it restored a convicted felon's civil rights through a certificate of discharge. We declined to reach the separation of powers argument in *Ways* because it had not been presented to or ruled on by the trial court.[5] A similar separation of powers argument is squarely before us now in this original mandamus action, and it presents an issue of first impression.

Statutes governing felon reenfranchisement have existed in Nebraska in one form or another for more than 150 years. But this case marks the first time we have considered a separation of powers challenge to the constitutionality of any reenfranchisement statute. Here, we are asked to consider constitutional challenges to the reenfranchisement provisions in L.B. 20. The central issue is the meaning of article VI, § 2, which provides in relevant part: "No person shall be qualified to vote who . . . has been convicted of treason or felony under the laws of the state or of the United States, unless restored to civil rights."

## ARGUMENTS OF PARTIES

The respondents contend the reenfranchisement provisions of L.B. 20 are unconstitutional for two reasons. Their primary argument is that only the Board of Pardons can restore felons' voting rights under article VI, § 2. Alternatively, they argue that even if the Legislature also has the power to enact statutes restoring voting rights, the reenfranchisement provisions in L.B. 20 did not accomplish that goal because article VI, § 2, refers to restoring "civil *rights*" plural, and L.B. 20 restored only the right to vote. (Emphasis supplied.)

The respondents, in their primary argument, assert that the reenfranchisement provisions of L.B. 20 violate the separation of powers clause,[6] because those statutory provisions effectively "exercise a power assigned by the Constitution to

---

[5] *Id*.

[6] Neb. Const. art. II, § 1.

the Board of Pardons."[7] According to the respondents, "the Constitution makes executive clemency the exclusive vehicle to re-enfranchise felons."[8] This is so, they argue, because a pardon is defined as an act that "'officially nullif[ies] punishment or other legal consequences of a crime.'"[9] They contend that since a pardon can restore civil rights, and since only the Board of Pardons has the authority to grant pardons,[10] that the separation of powers clause[11] is violated when the Legislature enacts statutes that restore civil rights without a pardon.

The relators see it differently. They generally agree with the respondents that a felon's civil rights *can* be restored by a full or partial pardon, but they disagree that a pardon is the *only* constitutionally permissible way to restore such rights. The relators contend that the Legislature has always had the authority to enact statutes establishing the policy and legal procedure for restoring felons' civil rights, including the right to vote under article VI, § 2. They argue that statutes restoring the right to vote do not amount to an improper exercise of the executive pardon power, and they argue that such statutes can effectively restore the right to vote without also restoring other civil rights.

Because the lead dissent finds the respondents' first constitutional argument persuasive, it does not address their second argument. For completeness, I address both arguments, but ultimately find that neither is sufficient to overcome

---

[7] Brief for respondent Secretary of State at 25.

[8] *Id*. at 25-26.

[9] *Kocontes v. McQuaid*, 279 Neb. 335, 352, 778 N.W.2d 410, 424 (2010) (quoting Black's Law Dictionary 1221 (9th ed. 2009)), *abrogated on other grounds, Doe v. Board of Regents*, 280 Neb. 492, 788 N.W.2d 264 (2010).

[10] See Neb. Const. art. IV, § 13 ("[t]he Governor, Attorney General and Secretary of State, sitting as a board, shall have power to remit fines and forfeitures and to grant respites, reprieves, pardons, or commutations in all cases of conviction for offenses against the laws of the state").

[11] See *id*. (same).

the presumption that a statute enacted by the Legislature is constitutional.[12]

## PRESUMPTION OF CONSTITUTIONALITY

To prove their defense that the reenfranchisement provisions of L.B. 20 are unconstitutional, the respondents face a steep burden of proof. All statutes are presumed to be constitutional, and courts will resolve all reasonable doubts in favor of a statute's constitutionality.[13] It is not the province of a court to annul a legislative act unless it clearly contravenes the constitution and no other resort remains.[14] With this quantum of proof in mind, I turn to the respondents' claims that L.B. 20 is unconstitutional.

## SEPARATION OF POWERS CLAIM

To overcome the presumption of constitutionality with respect to their separation of powers claim, the respondents must clearly show that the reenfranchisement provision in article VI, § 2, "makes executive clemency the exclusive vehicle to re-enfranchise felons"[15] and that the reenfranchisement provisions in L.B. 20 therefore have the effect of "exercis[ing] a power assigned by the Constitution to the Board of Pardons."[16] When the presumption of constitutionality is given the high level of deference it is due, I see no principled way to conclude the respondents have met their burden.

Although the lead dissenting opinion begins and ends its analysis by examining the legal effect of a pardon, I think the proper starting point is the constitutional text of article VI, § 2, so I begin there. But first, I recall the settled principles of constitutional construction that guide my analysis.

---

[12] See *State ex rel. Peterson v. Shively*, 310 Neb. 1, 963 N.W.2d 508 (2021).

[13] *Id*. Accord *State v. Gnewuch*, 316 Neb. 47, 3 N.W.3d 295 (2024).

[14] *Id*.

[15] Brief for respondent Secretary of State at 25-26.

[16] *Id*. at 25.

## PRINCIPLES OF CONSTITUTIONAL INTERPRETATION

A constitution represents the supreme written will of the people regarding the framework for their government.[17] The meaning of the Constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it.[18] Courts are not at liberty to construe into the constitution new principles that did not exist at the time of its adoption.[19] It is the duty of courts to ascertain and to carry into effect the intent and purpose of the framers of the constitution.[20]

The words in a constitutional provision must be interpreted and understood in their most natural and obvious meaning unless the subject indicates or the text suggests that they are used in a technical sense.[21] In ascertaining the intent of a constitutional provision from its language, courts may not supply any supposed omission, or add words to or take words from the provision as framed.[22] But it is permissible to consider the historical facts in determining the meaning of the language of the Nebraska Constitution.[23] It is also appropriate and helpful to consider, along with the historical background, the evil and mischief attempted to be remedied, the objects sought to be

---

[17] *State ex rel. Johnson v. Gale*, 273 Neb. 889, 734 N.W.2d 290 (2007); *Lemon v. Gale*, 272 Neb. 295, 721 N.W.2d 347 (2006).

[18] *First Trust Co. v. Smith*, 134 Neb. 84, 277 N.W. 762 (1938) (citing 1 Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union (8th ed. 1927)).

[19] *First Trust Co. v. Smith, supra* note 18.

[20] *State ex rel. Johnson v. Gale, supra* note 17.

[21] *Lemon v. Gale, supra* note 17.

[22] *Id*. Accord *Mekota v. State Board of Equalization and Assessment*, 146 Neb. 370, 19 N.W.2d 633 (1945) (courts may not supply what they deem unwise omissions, nor add words that substantially add to or take from constitution as framed).

[23] *Lemon v. Gale, supra* note 17.

accomplished, and the scope of the remedy its terms imply,[24] so that the provision is given a construction that appears best calculated to effectuate the design of the constitution.[25]

It is a fundamental principle that each and every clause within a constitution has been inserted for a useful purpose,[26] and a constitutional provision should not be construed in a way that defeats its purpose.[27] Our state constitution must be construed in the light of the history of the commonwealth, the surrounding circumstances, the subject matter under consideration, and the object sought to be attained, as well as the system of laws that were in force in the territory at the time of its adoption.[28]

Here, we are called upon to determine what the framers meant by the constitutional phrase "unless restored to civil rights." The relators contend the framers intended for the Legislature to carry this provision into effect through statute, and it has done so. The respondents disagree and contend the framers intended for executive pardon to be the exclusive method for restoring civil rights. In the sections that follow, I consider both contentions.

## MEANING OF ARTICLE VI, § 2

As stated, the lead dissent begins its constitutional analysis by exploring the origins and scope of the pardon power, and ultimately, it concludes that because a pardon has the effect of restoring civil rights, a pardon is the only constitutionally

---

[24] *Id.*

[25] See *State ex rel. School Dist. of Scottsbluff v. Ellis*, 168 Neb. 166, 95 N.W.2d 538 (1959).

[26] *Lemon v. Gale, supra* note 17.

[27] See *Meyers v. Blair Tel. Co.*, 194 Neb. 55, 230 N.W.2d 190 (1975) (stating constitutional provision creating Public Service Commission should not be construed narrowly as to defeat its purpose but should be construed liberally to effectuate purpose for which commission was created, which was primarily to serve public interest).

[28] *State ex rel. Johnson v. Chase*, 147 Neb. 758, 25 N.W.2d 1 (1946).

permissible way to restore civil rights within the meaning of article VI, § 2. While I do not disagree that pardons, both currently and historically, can restore civil rights after a felony conviction, I do not think that focusing on what the pardon power is or what it does tells us anything meaningful about whether the framers intended a pardon to be the only mechanism for restoring the right to vote under article VI, § 2. To ascertain the meaning and purpose of the phrase "unless restored to civil rights" in article VI, § 2, I examine the plain text of the constitutional provision using the interpretive principles just recited.

Article VI, § 2, is one of several provisions in the Nebraska Constitution that addresses suffrage, and the provision has been part of the constitution since its ratification in 1875. The Nebraska Constitution establishes the elective franchise as a fundamental right of all qualified voters and states that "there shall be no hindrance or impediment to the right of a qualified voter to exercise the elective franchise."[29] Qualified voters, in turn, are expressly defined in the constitution to mean "[e]very citizen of the United States who has attained the age of eighteen years . . . and has resided within the state and the county . . . for the terms provided by law . . . except as provided in section 2 of this article . . . ."[30] And article VI, § 2, provides: "No person shall be qualified to vote who is non compos mentis, or who has been convicted of treason or felony under the laws of the state or of the United States, unless restored to civil rights." The text of this constitutional provision has remained unchanged since 1875.[31]

As relevant here, the plain text of article VI, § 2, does two things: (1) It disenfranchises those who have been convicted of felonies, and (2) it enshrines in the constitution a right to

---

[29] Neb. Const. art. I, § 22.

[30] Neb. Const. art. VI, § 1.

[31] See Neb. Const. art. VII, § 2 (1875) (transferred by constitutional convention in 1919-1920 to art. VI, § 2).

reenfranchisement upon being "restored to civil rights." But unlike some state constitutions, the Nebraska Constitution does not expressly grant the power to restore civil rights to any of the three branches, nor does it specify the method or criteria by which civil rights in general, or voting rights specifically, are to be restored.[32] This is significant for two reasons.

First, because article VI, § 2, establishes the constitutional policy that a felon's right to vote can be restored, but does so without prescribing the means or method to carry that policy into effect, the reenfranchisement provision is not self-executing.[33] And when a constitutional provision is not self-executing, it is generally understood that the Legislature

---

[32] Compare, e.g., N.J. Const. art. II, § 1, ¶ 7 (providing that felony conviction deprives persons of right to vote but "[a]ny person so deprived, when pardoned or otherwise restored by law to the right of suffrage, shall again enjoy that right"); Ky. Const. § 145 (providing that felony conviction operates to exclude suffrage rights but those excluded "may be restored to their civil rights by executive pardon"); Utah Const. art. IV, § 6 (providing that any person convicted of felony may not be permitted to vote until such right "is restored as provided by statute"); N.C. Const. art. VI, § 2 (providing that no person adjudged guilty of a felony "shall be permitted to vote unless that person shall be first restored to the rights of citizenship in the manner prescribed by law"); Or. Const. art. II, § 3 (providing that "privilege of an elector, upon conviction of any crime which is punishable by imprisonment in the penitentiary, shall be forfeited, unless otherwise provided by law"); Fla. Const. art. VI, § 4 (providing that "any disqualification from voting arising from a felony conviction shall terminate and voting rights shall be restored upon completion of all terms of sentence including parole or probation").

[33] See, e.g., *State ex rel. Lamm v. Nebraska Bd. of Pardons*, 260 Neb. 1000, 620 N.W.2d 763 (2001); *In re Applications A-16027 et al.*, 242 Neb. 315, 495 N.W.2d 23 (1993), *modified on denial of rehearing* 243 Neb. 419, 499 N.W.2d 548; *Indian Hills Comm. Ch. v. County Bd. of Equal.*, 226 Neb. 510, 412 N.W.2d 459 (1987); *State, ex rel. Walker, v. Board of Commissioners*, 141 Neb. 172, 3 N.W.2d 196 (1942). See, also, *Davis v. Burke*, 179 U.S. 399, 403, 21 S. Ct. 210, 45 L. Ed. 249 (1900) (recognizing rule that constitutional provision "'is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law'").

may enact legislation to carry it into effect.[34] Indeed, article III, § 30, of the Nebraska Constitution expressly directs: "The Legislature shall pass all laws necessary to carry into effect the provisions of this constitution."

Second, article I, § 26, of the Nebraska Constitution recognizes that "all powers not herein delegated[] remain with the people." Because the framers did not expressly give the power to restore civil rights under article VI, § 2, to any department or branch of government, that power remains with the people. And because the Nebraska Constitution is not a grant of power, but a limitation of power, the widely accepted doctrine is that legislative capacity that is not constitutionally inhibited or prohibited is retained in the people and may be exercised in the Legislature by representatives of the people.[35] Moreover, this court has long recognized that it is the Legislature's function through the enactment of statutes to declare what is the law and public policy of this state.[36]

In this mandamus action, I do not understand any party to contend the reenfranchisement provisions of article VI, § 2, are self-executing and therefore require no governmental action to be carried into effect. And other courts construing similar constitutional reenfranchisement provisions have rejected such a construction. In *Schroeder v. Simon*,[37] the Minnesota Supreme Court considered a constitutional provision similar to Nebraska's that provided "'a person who has been convicted of treason or felony'" is not entitled to vote "unless restored to civil rights." Minnesota also has a statute that automatically restores all civil rights of convicted

---

[34] See *id*.

[35] *State ex rel. Creighton Univ. v. Smith*, 217 Neb. 682, 353 N.W.2d 267 (1984).

[36] *Nebraska Journalism Trust v. Dept. of Envt. & Energy,* 316 Neb. 174, 3 N.W.3d 361 (2024).

[37] *Schroeder v. Simon*, 985 N.W.2d 529, 536 (Minn. 2023) (quoting Minn. Const. art. VII, § 1).

persons once they have been "discharged."[38] In *Schroeder*, several convicted persons who were living in the community on probation or supervised release, but who had not yet been discharged from their sentence, filed a declaratory judgment action seeking a judicial determination that Minnesota's constitutional provision should be construed to automatically restore voting rights once an offender has been released or excused from incarceration. Minnesota's Secretary of State argued the constitutional provision "unless restored to civil rights" must be construed to require "some affirmative act of the government,"[39] which the Secretary argued could include either legislation establishing a mechanism for restoring the right to vote or nullification of the underlying conviction through a pardon. After considering the plain text of the constitutional provision and reviewing the history of the various statutes providing procedures for restoring civil rights, the Minnesota Supreme Court concluded the phrase "unless restored to civil rights" did not create a mandate to restore civil rights by any particular method. Instead, it required "some affirmative act of, or mechanism established by, the government" to be carried into effect, and it reasoned that such an act could include either "an absolute pardon that nullifies the felony conviction" or "a legislative act that generally restores the right to vote upon the occurrence of certain events."[40] *Schroeder* did not involve a separation of powers challenge like we have here, but the case illustrates that the constitutional phrase "unless restored to civil rights" is not

---

[38] Minn. Stat. § 609.165 (2022).

[39] *Schroeder v. Simon, supra* note 37, 985 N.W.2d at 538.

[40] *Id.* at 545. Accord, *League of Women Voters of Wis. v. Walker*, 357 Wis. 2d 360, 374, 851 N.W.2d 302, 309 (2014) (recognizing "'[t]he persons who may exercise the right of suffrage . . . are fixed by the constitution'" but "'[t]hese provisions are not and were never intended to be self-executing or exclusive of regulation in other respects. . . . [T]he power to prescribe the manner of conducting elections is clearly within the province of the legislature'").

self-executing and is broad enough to encompass restoration through either legislation or executive pardon.

The dissent concedes, as it must, that the Nebraska Constitution "does not include an express provision authorizing the Board of Pardons to restore civil rights" under article VI, § 2, nor does the constitution expressly give the Pardons Board the authority to "restore civil rights." At the very least, this creates reasonable doubt about whether the respondents can establish their claim that the framers intended the phrase "unless restored to civil rights" to refer exclusively to executive clemency. Respectfully, I see no textual support for concluding that the framers intended the right of reenfranchisement under article VI, § 2, to depend exclusively on the executive pardon power.

Instead, because the constitutional text does not expressly grant the power to restore voting rights to any branch or department and is silent as to how such rights are to be restored, the constitutional text alone does not support the respondents' contention that only a pardon can restore voting rights under article VI, § 2. In the next section, I consider whether there is anything in the laws or history of our state that would clearly support the respondents' contention.

## HISTORY OF VOTER REENFRANCHISEMENT UNDER ARTICLE VI, § 2

Courts can consider extrinsic historical facts in determining the meaning of the language of the Nebraska Constitution,[41] but in my opinion, a review of the available history surrounding voter reenfranchisement in Nebraska does not help the respondents clearly establish their claim that the phrase "unless restored to civil rights" was intended by the framers to refer only to reenfranchisement by executive pardon.

Although courts are permitted to take judicial notice of the proceedings of the constitutional convention at which the

---

[41] *Lemon v. Gale, supra* note 17.

sections of the constitution at issue were framed,[42] we have not been directed to any proceedings where the framers discussed or debated the reenfranchisement provision. Presumably, that is because the minutes from the 1875 constitutional convention appear to have been lost.[43] We thus have no constitutional convention records suggesting whether the framers intended that voting rights under article IV, § 2, would be restored by legislative enactment, executive pardon, or both.

Courts may also consider the law in force at the time the constitutional provision was adopted in 1875.[44] But I am not persuaded that either Nebraska case law or statutes from that era support the respondents' position that the framers intended reenfranchisement under article VI, § 2, to depend exclusively on an executive pardon.

We have been directed to no Nebraska cases from that era addressing voter reenfranchisement under article VI, § 2. But a 1905 case discussing the related issue of juror disqualification for felony convictions states it was the "custom" at that time, when a prisoner was released from the penitentiary, "to insert in the order for his discharge a provision declaring the convict to be restored to all his civil rights in all respects the same as though a pardon had been granted."[45] The judicial recognition of such a "custom" in 1905 seriously undermines the respondents' argument that the framers intended that a general pardon was the only way to restore civil rights under article VI, § 2.

As for the statutes in force in 1875, the respondents note that an 1873 statute prohibited any person "sentenced to be punished for any felony (when sentence shall not have been

---

[42] *State ex rel. Johnson v. Marsh*, 149 Neb. 1, 29 N.W.2d 799 (1947).

[43] See Addison E. Sheldon, Official Report of the Debates and Proceedings in the Nebraska Constitutional Convention at 10 (1906). See, also, *State ex rel. Johnson v Chase,* supra note 28 (noting proceedings of 1875 constitutional convention were destroyed by fire).

[44] See *State ex rel. Johnson v. Chase, supra* note 28.

[45] *Turley v. State*, 74 Neb. 471, 476, 104 N.W. 934, 936 (1905).

reversed or annulled)" from voting, serving on a jury, or holding public office "unless said convict shall receive from the governor of this state a general pardon . . . in which case said convict shall be restored to his civil rights and privileges."[46] The respondents argue this statute "strongly suggests clemency is the only authority that can re-enfranchise felons."[47] I respectfully disagree.

To me, it is significant that the framers did not use readily available language from the 1873 statute when adopting the disenfranchisement and reenfranchisement provisions of article VI, § 2. The 1873 statute disenfranchised any person sentenced for a felony when the sentence was not reversed or annulled, whereas the framers chose to disenfranchise any person convicted of treason or a felony. Moreover, the 1873 statute provided that a general pardon would restore the person's civil rights and privileges, whereas the framers were silent about how or when civil rights are to be restored. If the framers had intended the right to reenfranchisement under article VI, § 2, to depend exclusively on executive pardon, surely they would not have left such an important point to implication. And since the framers did not qualify reenfranchisement in this way, courts should not supply any supposed omission, or add words to the provision as framed.[48]

The respondents also contend that legislative enactments in the years after the constitution was ratified support their claim that executive pardon is the only way to restore voting rights under article VI, § 2. They argue, for instance, that for "132 years, Nebraska re-enfranchised felons exclusively through executive clemency."[49] And they state it "was not until 2005 . . . that a statute first attempted to re-enfranchise

---

[46] Gen. Stat. ch. 58, § 258, p. 783 (1873).

[47] Brief for respondent Secretary of State at 30.

[48] See, *Lemon v. Gale, supra* note 17; *Mekota v. State Board of Equalization and Assessment, supra* note 22.

[49] Brief for respondent Secretary of State at 23.

felons outside of executive clemency."[50] These statements are not historically correct. And since the statutory history recited in the per curiam opinion is limited, I expand on it here.

When the constitution was adopted in the fall of 1875, the 1873 statute discussed above was not the only law providing a method for restoring a felon's civil rights. Another statute in effect at the time provided an alternative method to restore civil rights through a "warrant of discharge."[51] That statute, adopted in February 1875, authorized inmates confined in the penitentiary to earn a reduction in the term of their sentence for good conduct, and further provided:

> The governor shall, upon receiving certificate of good conduct from the warden and inspectors, immediately issue his warrant for discharge of such convict; *said warrant shall in all cases restore the prisoner to civil rights the same as though a pardon had been issued.*[52]

The Legislature's enactment of this statute likely explains why, by 1905, this court described it as the "custom" when discharging a prisoner to include a provision restoring civil rights "the same as though a pardon had been granted."[53]

As such, when the constitution was adopted in 1875, there were statutes on the books authorizing at least two methods for restoring civil rights after a felony conviction—one method relied on a general pardon, and the other relied on a warrant of discharge to restore civil rights without a pardon. Presumably, the framers were aware of both statutory methods when they selected the passive phrase "unless restored to civil rights" for inclusion in article IV, § 2. The existence of alternative statutory methods for restoring civil rights in 1875 seriously undermines the respondents' contention that the framers intended that only a pardon could restore civil rights.

---

[50] *Id*. at 30.

[51] See 1875 Neb. Laws, General Laws, p. 33, § 3.

[52] *Id.* (emphasis supplied) (later codified as Rev. Stat. § 9234 (1913)).

[53] See *Turley, supra* note 45, 74 Neb. at 476, 104 N.W. at 936.

It is also significant that, in the years after the constitution was adopted, the Legislature continued to recognize multiple methods for restoring civil rights. After the Board of Pardons was authorized by constitutional amendment in 1920,[54] the Legislature amended the 1873 statute referenced above to provide that any "general pardon" restoring civil rights must come from the Board of Pardons.[55] Eventually codified as Neb. Rev. Stat. § 29-112 (Cum. Supp. 1951), this statute remains part of Nebraska's criminal procedure statutes today.[56] Section 29-112 has been amended several times over the years, and it has always both mandated the disenfranchisement of persons "sentenced" for felonies that were not reversed or annulled, and established various methods for reenfranchisement.

Creation of the Board of Pardons in 1920 also prompted changes to the warrant of discharge method for restoring civil rights.[57] The Legislature enacted Comp. Stat. § 10262, which provided:

> Whenever any convict shall have completed the lawful requirements of his sentence, the board of pardons, upon receiving [a] certificate of good conduct from the warden, shall immediately issue a warrant for the discharge of such convict, and such warrant shall in all cases restore the prisoner's civil rights the same as though a pardon had been issued.

This statute was later codified in the criminal procedure statutes as Neb. Rev. Stat. § 29-2634 (Reissue 1956), and for more than 40 years, this statute had the effect of mandating the restoration of civil rights, without a pardon, for

---

[54] See Neb. Const. art. IV, § 13 (1920).

[55] 1951 Neb. Laws, ch. 86, § 1, p. 249.

[56] See § 29-112 (Reissue 2016).

[57] See, 1921 Neb. Laws, ch. 182, art. II, § 15, p. 694 (1921); Comp. Stat. § 10262 (1922).

felony offenders with good conduct who completed the lawful requirements of their sentence.[58]

In 1959, the Legislature amended § 29-112 to eliminate the language requiring a "general pardon" and to substitute in its place the requirement that a "warrant of discharge" from the Board of Pardons would be the method for restoring a felon's civil rights and privileges.[59] This amendment was recommended by the Attorney General at the time, and the stated intent of the amendment was to "correct[] an inconsistency" in the two statutory methods for restoring felons' civil rights:

> Statute 29-2634 provides that a "warrant of discharge" restores civil rights. However, Section 29-112 provides that for a prisoner to receive a restoration of his civil rights, he must have a general pardon. . . . This bill corrects this inconsistency by amending Statute 29-112 to make it clear that a warrant of discharge does restore civil rights. As a matter of policy, the Attorney General states that a warrant of discharge should be sufficient to require restoration of civil rights.[60]

The Attorney General testified in favor of the 1959 bill, explaining:

> A general pardon is a procedure which we use occasionally but largely to keep people from being deported from this country, because the federal government won't recognize anything but a general pardon. To get a general pardon requires application, notice, notice of hearing, and a hearing. It is entirely in conflict with other statutes which provide for a warrant of discharge.[61]

---

[58] Accord *Turley v. State, supra* note 45.

[59] 1959 Neb. Laws, ch. 117, §§ 1 and 2, pp. 448-49 (codified as § 29-112 (Cum. Supp. 1959)).

[60] Statement of Purpose, L.B. 305, Judiciary Committee, 69th Leg. (Feb. 4, 1959).

[61] Judiciary Committee Hearing, L.B. 305, 69th Leg. (Feb. 2, 1959).

As amended in 1959, § 29-112 provided that felons whose sentences had not been reversed or annulled were "deemed incompetent to be an elector . . . unless such convict shall receive from the Board of Pardons of this state a warrant of discharge, in which case such convict shall be restored to his civil rights and privileges."[62]

In 1969, Neb. Rev. Stat. § 29-2635 (Reissue 1964) was repealed as part of a comprehensive overhaul of the statutes governing pardons and parole.[63] As part of that overhaul, the Board of Parole was given the authority to restore civil rights by issuing a "certificate of discharge."[64] Under the 1969 statutory scheme, the Board of Parole was required to issue a certificate of discharge "[w]henever any committed offender or parolee shall have completed the lawful requirements of his sentence or parole," and "such certificate shall restore the civil rights of such committed offender or parolee as though a pardon had been issued."[65] In 1975, the Legislature amended the statute, codified at the time as § 83-1,118(4) (Reissue 1971), to require that the Director of Correctional Services, rather than the Board of Parole, would issue the certificate of discharge restoring civil rights.[66] The director retained that authority through two more statutory amendments.[67]

Then in 2001, the Attorney General issued an advisory opinion concluding that "the Board of Pardons is not required to issue a warrant of discharge" and that "restoration of any civil rights which are forfeited by an offender upon conviction of a felony is a matter within the discretion of the Board of Pardons."[68] The Attorney General reasoned that

---

[62] § 29-112 (Reissue 1964).

[63] See 1969 Neb. Laws, ch. 817, § 87, pp. 3112-13.

[64] Id., § 49(4), pp. 3098-99.

[65] Id. (codified as § 83-1,118(4) (Reissue 1971)).

[66] See 1975 Neb. Laws, L.B. 567, § 8.

[67] See 1992 Neb. Laws, L.B. 816, § 6, and 1994 Neb. Laws, L.B. 677, § 10.

[68] Att'y Gen. Op. No. 01011 (Mar. 23, 2001).

although the Legislature "purport[ed] to mandate the issuance of such warrants of discharge by the Board" when it amended § 29-112 in 1959, the clemency power belonged exclusively to the Board of Pardons and thus "the Legislature may not mandate that the Board of Pardons exercise that power."[69] The Attorney General's opinion further concluded that to the extent § 83-1,118 "purported to restore such civil rights upon . . . discharge from incarceration" through a certificate of discharge, it "did not operate to restore such rights."[70] The Attorney General reasoned that "the Legislature cannot usurp the constitutional powers of the Board of Pardons, even if the Legislature attempts to delegate those powers to another agency within the executive branch."[71]

In 2002, the Legislature amended the warrant of discharge provisions in § 29-112 and the certificate of discharge provisions of § 83-1,118.[72] As amended by 2002 Neb. Laws, L.B. 1054, § 29-112 provided that a warrant of discharge issued by the Board of Pardons had the effect of restoring "such civil rights and privileges as enumerated or limited by the Board of Pardons" and "shall not release such person from the costs of conviction unless otherwise ordered by the Board of Pardons."[73] And L.B. 1054 amended § 83-1,118 to provide:

> Upon completion of the lawful requirements of the sentence, the [D]epartment [of Correctional Services] shall provide the parolee or committed offender with a written notice regarding his or her civil rights. The notice shall inform the parolee or committed offender that voting rights are not restored upon completion of the sentence. The notice shall also include information on restoring

---

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] See 2002 Neb. Laws, L.B. 1054, §§ 3 and 28.

[73] § 29-112 (Cum. Supp. 2002).

such civil rights through the pardon process, including application to and hearing by the Board of Pardons.[74]

In 2005, the Legislature again amended §§ 29-112 and 83-1,118.[75] As amended by 2005 Neb. Laws, L.B. 53, § 29-112 no longer required a warrant of discharge from the Board of Pardons to restore voting rights, and instead provided: "Any person sentenced to be punished for any felony, when the sentence is not reversed or annulled, is not qualified to vote until two years after he or she has completed the sentence, including any parole term. The disqualification is automatically removed at such time."[76] However, L.B. 53 still required a warrant of discharge from the Board of Pardons to restore the right to serve on a jury and to hold public office.[77] Similarly, L.B. 53 amended § 83-1,118(5) to provide:

Upon completion of the lawful requirements of the sentence, the department shall provide the parolee or committed offender with a written notice regarding his or her civil rights. The notice shall inform the parolee or committed offender that voting rights are restored two years after completion of the sentence. The notice shall also include information on restoring such other civil rights through the pardon process, including application to and hearing by the Board of Pardons.[78]

L.B. 53 was passed over a gubernatorial veto, but the constitutionality of the act was not challenged in the courts during the time it remained in effect.

And most recently, in 2024, the Legislature passed L.B. 20, which again amended §§ 29-112 and 83-1,118.[79] As amended by L.B. 20, § 29-112 now provides: "Any person

---

[74] § 83-1,118(5) (Cum. Supp. 2002).

[75] See 2005 Neb. Laws, L.B. 53, §§ 1 and 7.

[76] § 29-112 (Cum. Supp. 2006).

[77] See *id.*

[78] § 83-118(5) (Cum. Supp. 2006).

[79] 2024 Neb. Laws, L.B. 20, §§ 1 and 7.

sentenced to be punished for any felony, when the sentence is not reversed or annulled, is not qualified to vote until such person has completed the sentence, including any parole term. The disqualification is automatically removed at such time." However, L.B. 20 still requires a warrant of discharge from the Board of Pardons to restore the right to serve on a jury and to hold public office.[80]

L.B. 20 also amended the relevant provision in § 83-1,118, which now provides:

> (4) Upon completion of the lawful requirements of the sentence, the department shall provide the parolee or committed offender with a written notice regarding his or her civil rights. The notice shall inform the parolee or committed offender that voting rights are restored upon completion of the sentence. The notice shall also include information on restoring other civil rights through the pardon process, including application to and hearing by the Board of Pardons.[81]

Several election statutes were also amended by L.B. 20, including those governing the voter registration process and related forms and notices.[82] As noted by the per curiam opinion, the Governor declined to sign L.B. 20 but allowed it to become law without his signature.[83]

To summarize, this complicated statutory history illustrates that from 1873 to 1959, § 29-112 and its predecessor statutes conditioned reenfranchisement on a "general pardon." But from 1875 to 1969, a "warrant of discharge" was considered a statutory alternative to a pardon that had the effect of automatically "restor[ing] the prisoner's civil rights the same as

---

[80] *Id*., L.B. 20, § 1.

[81] *Id*., L.B. 20, § 7.

[82] See *id*., §§ 4 and 5 (amending Neb. Rev. Stat. §§ 32-312 (Cum. Supp. 2022) and 32-313 (Reissue 2016)).

[83] See Legislative Journal, 108th Leg., 2d Sess. 1804-05 (Apr. 17, 2024).

though a pardon had been issued."[84] And from 1969 to 2002, the Legislature authorized other executive branch officers to automatically restore felons' civil rights through a "certificate of discharge" once their sentence was served.[85] This statutory history refutes the respondents' claims that for "132 years, Nebraska re-enfranchised felons exclusively through executive clemency"[86] and that it "was not until 2005 . . . that a statute first attempted to re-enfranchise felons outside of executive clemency."[87]

It is also relevant that statutes authorizing a variety of reenfranchisement methods have been on the books through every constitutional amendment since 1875, yet the text of article VI, § 2, remains the same today as it was in 1875. And until this year, no court has considered a claim that any of the many statutory reenfranchisement methods violate the separation of powers. We have recognized that "[w]hile long-standing practices of government may not be determinative of a constitutional question, as the U.S. Supreme Court has recognized, they can inform a determination of whether a particular delegation of power is constitutional."[88] That principle applies here, and it weighs heavily against a finding of unconstitutionality.

RESPONDENTS HAVE NOT CLEARLY ESTABLISHED
THEIR SEPARATION OF POWERS CLAIM

In my opinion, the respondents have failed to clearly show that either the constitutional text, or the history of voter

---

[84] See, 1875 Gen. Laws, p. 33, § 3; Rev. Stat. § 9234 (1913); Comp. Stat. § 10262 (1922); Neb. Rev. Stat. § 29-2634 (Reissue 1956).

[85] See 1969 Neb. Laws, ch. 817, § 49(4), pp. 3098-99; 1975 Neb. Laws, L.B. 567, § 8; 1992 Neb. Laws, L.B. 816, § 6; and 1994 Neb. Laws, L.B. 677, § 10. Accord *Ways v. Shively, supra* note 4.

[86] Brief for respondent Secretary of State at 23.

[87] *Id*. at 30.

[88] *State v. Gnewuch,* supra note 13, 316 Neb. at 73-74, 3 N.W.3d at 316.

reenfranchisement laws in Nebraska, supports their assertion that the phrase "unless restored to civil rights" was intended by the framers to refer only to reenfranchisement by executive pardon. And without such a showing, they cannot clearly establish that "the Constitution makes executive clemency the exclusive vehicle to re-enfranchise felons,"[89] or that the reenfranchisement provisions in L.B. 20 have the effect of "exercis[ing] a power assigned by the Constitution to the Board of Pardons."[90] Because the respondents have not overcome the presumption that L.B. 20 is constitutional, their separation of powers claim should be rejected by this court.

On this record, I see no reason to engage in a lengthy separation of powers analysis because the respondents have not, and cannot, clearly establish their foundational premise that the phrase "unless restored to civil rights" was intended by the framers to refer exclusively to reenfranchisement by executive pardon. In other words, since the respondents never established that the power to reenfranchise felons was given exclusively to the executive pardoning authority in the constitution, there is no need to ask whether it would violate the separation of powers clause for the Legislature to enact reenfranchisement statutes.

That said, if I had been persuaded that a careful separation of powers analysis was warranted, I would apply the framework this court uses when analyzing the overlapping exercise of constitutionally permitted powers.[91] The history described above illustrates that for more than a century both the legislative and executive branches have staked out territory in

---

[89] Brief for respondent Secretary of State at 25-26.

[90] *Id*. at 25.

[91] See, generally, *State ex rel. Veskrna v. Steel*, 296 Neb. 581, 894 N.W.2d 788 (2017); *Adams v. State*, 293 Neb. 612, 879 N.W.2d 18 (2016). See, also, *State v. Gnewuch, supra* note 13.

the realm of felon reenfranchisement. And both branches can point to express constitutional authority for doing do so.[92]

As stated, the relators generally argue the power to restore voting rights falls naturally within the express constitutional power of the Legislature to implement the provisions of article VI, § 2, and to declare what is the law and public policy of this state. And the respondents generally argue that because a pardon nullifies the legal consequences of a felony conviction,[93] the power to restore voting rights falls naturally within the constitutional authority expressly granted to the Board of Pardons in article IV, § 13.

When called upon to analyze the overlapping exercise of constitutionally permitted powers, this court has focused on the extent to which one branch is prevented from accomplishing its constitutionally assigned functions, balanced against the other branch's need to promote the objectives within its constitutional authority.[94] In doing so we have considered the following factors: (1) the essential nature of the power being exercised, (2) the degree of control by one department over another, (3) the objective sought to be attained by that branch's exercise of power, and (4) the practical result of the blending of powers as shown by actual experience over a period of time.[95]

In this mandamus action, we have not been presented with a stipulated record that would permit thoughtful application of

---

[92] See, e.g., Neb. Const. art. III, § 30 (Legislature given express authority to pass all laws necessary to carry into effect provisions of constitution); Neb. Const. art. IV, § 13 (Board of Pardons given express authority to grant pardons in all cases of conviction for offenses).

[93] See *Kocontes v. McQuaid, supra* note 9, 279 Neb. at 352, 778 N.W.2d at 424 (defining pardon as "'officially nullifying punishment or other legal consequences of a crime'").

[94] See, *State ex rel. Veskrna v. Steel, supra* note 91; *Adams v. State, supra* note 91. See, also, *State v. Gnewuch, supra* note 13.

[95] *State ex rel. Veskrna v. Steel, supra* note 91. See *State v. Gnewuch, supra* note 13.

these four factors. But I have serious doubts about whether the respondents could establish that the reenfranchisement provisions of L.B. 20, which take effect only after an offender has completed his or her sentence, prevent the Board of Pardons from accomplishing any of its constitutionally assigned functions.[96]

## RESPONDENTS' ALTERNATIVE CONSTITUTIONAL CHALLENGE HAS NO MERIT

The respondents' alternative constitutional claim is far less complicated. They argue that even if the Legislature does have the authority to enact statutes restoring voting rights, L.B. 20 does not accomplish that goal because article VI, § 2, uses the plural term "civil rights*"* and that "forecloses restoration of the franchise by itself."[97] In other words, the respondents contend that the only constitutionally permissible way to restore the right to vote under article VI, § 2, is to simultaneously restore other civil rights too. I am not persuaded.

In *Ways v. Shively*, when considering the constitutional phrase "unless restored to civil rights" as part of our statutory analysis, this court observed that "[t]he right to vote is a civil right" and that "the restoration referred to in Neb. Const. art. VI, § 2, is the restoration of the right to vote."[98] Both seem obvious, and such a construction is consistent with the canon that when considering the meaning of a constitutional provision, it is proper to consider the objects sought to be accomplished, to consider the scope of the remedy its terms imply, and to give it such an interpretation as appears best calculated to effectuate the design of the constitution.[99] Because this court has already construed the phrase "unless restored to civil rights" in article VI, § 2, to be referring to restoration of a

---

[96] See Neb. Const. art. IV, § 13.

[97] Brief for respondent Secretary of State at 26.

[98] *Ways v. Shively, supra* note 4, 264 Neb. at 255, 546 N.W.2d at 626.

[99] See *State ex rel. School Dist. of Scottsbluff v. Ellis, supra* note 25.

felon's right to vote and not to restoration of all civil rights, I cannot find the respondents have carried their burden to clearly show that the only constitutionally permissible way to restore the right to vote under article VI, § 2, is to simultaneously restore other civil rights too.

## RELATORS ARE ENTITLED
## TO PEREMPTORY WRIT

On this record, the respondents have not met their burden to clearly establish that the reenfranchisement provisions of L.B. 20 are unconstitutional under either of the two theories they advance. The relators, on the other hand, have shown that they have a clear right to the relief sought, that there is a clear duty on the part of the respondents to comply with and implement the provisions of L.B. 20, and that because the registration deadline for voting in the 2024 general election is fast approaching, they have no other plain and adequate remedy available in the ordinary course of law. I agree the peremptory writ should issue, directing the respondents to comply in all respects with L.B. 20.

Papik, J., concurring.

I concur in the issuance of the writ of mandamus.

As to whether the respondents should be able to raise the constitutionality of the reenfranchisement provisions of 2024 Neb. Laws, L.B. 20, in this mandamus proceeding, I do not believe we need to reach the question. I would not reach the question because even assuming the question of constitutionality may be raised, on this record, I do not believe the respondents have carried their burden to show that the reenfranchisement provisions of L.B. 20 are unconstitutional.

In my analysis of the merits of the constitutional issue, two principles are paramount. First, that in determining the meaning of the Nebraska Constitution, "[t]he intent and understanding of its framers and the people who adopted it as expressed in the instrument is the main inquiry in construing

it." *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 340, 37 N.W.2d 502, 507 (1949). Second, that in deciding whether a statute violates the constitution, courts are to presume that statutes are constitutional and to resolve all doubts in favor of constitutionality. See *State ex rel. Peterson v. Shively*, 310 Neb. 1, 963 N.W.2d 508 (2021). Applying those principles in this case, I have doubts about whether the Nebraska Constitution would have originally been understood to prohibit the legislative restoration of the right to vote. I explain why below.

First, article VI, § 2, of the constitution merely states that individuals convicted of felonies cannot vote "unless restored to civil rights," but does not specify how civil rights can be restored. If the framers of the constitution had intended to make restoration of the right to vote contingent on action of the pardoning authority, they easily could have done so without leaving the issue to implication.

Moreover, as discussed in greater detail in Justice Stacy's opinion, there is a significant history of statutes providing for the restoration of civil rights outside of the unfettered discretion of the pardoning authority. It is particularly difficult for me to conclude that the constitution was originally understood to leave the question of restoration of civil rights exclusively to the unfettered discretion of the pardoning authority, when a statute passed in 1875—the same year the constitution was enacted—provided that the Governor "shall, upon receiving certificate of good conduct from the warden and inspectors, immediately issue his warrant for discharge of such convict; said warrant shall in all cases restore the prisoner to civil rights the same as though a pardon had been issued." 1875 Gen. Laws, p. 33, § 3 (later codified as Rev. Stat. § 9234 (1913)). This statute remained in effect until 1921, when, after the Board of Pardons was formed, it was amended to require the Board of Pardons to issue a warrant of discharge and provided that "such warrant shall in all cases restore the prisoner's civil rights the same as though a pardon had

been issued." Comp. Stat. § 10262 (1922). See, also, *Turley v. State*, 74 Neb. 471, 476, 104 N.W. 934, 936 (1905) (referring to "custom" of discharge order "declaring the convict to be restored to all his civil rights in all respects the same as though a pardon had been granted").

These early statutes appear to *compel* the Governor, and later the Board of Pardons, to restore the civil rights of certain offenders upon completion of their sentences. They thus cast doubt upon the respondents' position that, under the constitution, restoration of voting rights was left to the unfettered discretion of the pardoning authority. Statutes enacted contemporaneously with constitutional provisions are recognized as strong evidence of constitutional meaning. See, e.g., *Bowsher v. Synar*, 478 U.S. 714, 106 S. Ct. 3181, 92 L. Ed. 2d 583 (1986).

As for the respondents' separation of powers argument embraced by some of my colleagues, I acknowledge that the respondents make a plausible case that the restoration of voting rights shares some attributes of a pardon or partial pardon. But given the considerations mentioned above, I nonetheless have doubts about whether the separation of powers provision of the Nebraska Constitution was originally understood to forbid a legislative role in the restoration of voting rights.

With respect to the respondents' alternative argument that the reenfranchisement provisions of L.B. 20 are unconstitutional, I agree with Justice Stacy's reasoning and likewise am not convinced the Nebraska Constitution was originally understood to require the restoration of multiple civil rights in order to restore the right to vote.

As discussed in Chief Justice Heavican's opinion, this case has required this court, on a short timeframe, to analyze the original meaning of constitutional and statutory provisions adopted over a century ago. Having considered the record, the relevant history, and the arguments made by the parties in that short timeframe, I lack the "clear and strong conviction" necessary to find the reenfranchisement provisions of L.B. 20

unconstitutional. See *Planned Parenthood of the Heartland v. Hilgers, ante* p. 217, 227, 9 N.W.3d 604, 612 (2024) (internal quotation marks omitted).

MILLER-LERMAN, J., concurring in part, and in part dissenting.

Because I do not believe that constitutionality of statute can be raised as a defense to mandamus, I dissent from the reasoning of the per curiam opinion to the contrary and I would conclude the constitutionality of statute is not properly before us. Nevertheless, because I conclude 2024 Neb. Laws, L.B. 20, and 2005 Neb. Laws, L.B. 53, are constitutional, and I agree that the writ of mandamus should issue and order the Nebraska Secretary of State and election commissioners to obey the laws and register to vote felons who have completed their sentences, I concur in the result.

Further, at the risk of seeming impolite and wishing it were otherwise, I write separately because of my belief that the separation of powers issue in this case includes not only the obvious tension between the executive and legislative branches, but also the tension between the executive and judicial branches. In this regard, despite a challenge by the executive branch, I believe the true separation of powers story of this case is ultimately the preservation of the judiciary's power, including the power to declare what statutes are constitutional.

In answer to the per curiam and other separate opinions, as to procedure: On July 17, 2024, 2 days before L.B. 20 would have gone into effect, thus restoring felons' eligibility to register to vote in the current election year, and nearly two decades after L.B. 53 was passed in 2005, the state actors issued a nonbinding opinion followed by a directive to reject voter registrations. Why now? Why not take the opportunity to challenge the laws long ago with available remedies, rather than creating uncertainty at this time? Why did the court enable the tardiness by expanding mandamus?

In answer to the dissenting view as to substance: The restoration of voting rights by the Nebraska Legislature is not a full restoration of civil rights; it is not a full pardon, which is reserved to Nebraska's Board of Pardons in the executive branch. See Neb. Const. art. IV, § 13. And it is not a "form of pardon" or a "partial pardon" as that term was understood in the 1800s when article VI, § 2, of the Nebraska Constitution was written. Article VI, § 2, creates the right of reenfranchisement for felons who have completed their sentences, but it is not self-executing. The mechanism for restoration of this right by statute enacted by the Legislature does not diminish or impair the Board of Pardons, composed of Nebraska's Governor, Attorney General, and Secretary of State located in the executive branch, nor violate constitutional separation of powers found in Neb. Const. art. II, § 1. In my view, L.B. 20 and L.B. 53 are constitutional. If L.B. 20 and L.B. 53 were declared unconstitutional as urged by some members of the court, such decision would effectively disenfranchise the nearly 59,000 felons who were eligible to vote in 2005 under L.B. 53, and would take away a right. Reenfranchisement of felons is a policy decision. The Legislature made that policy decision when it adopted L.B. 20 and L.B. 53. An opinion that would find the statutes unconstitutional would not protect separation of powers, but contrary to the constitution, would enable consolidation of power in the executive branch. If the statutes were declared unconstitutional as urged by some members of the court, the elected officials would choose their voters instead of the other way around.

*Procedure. Timing Is Everything. Let the Games Begin or Was It Mere Coincidence? Question: Who Decides Constitutionality of Statutes? Answer: The Judicial Branch.*

Knowledge of the timeline is important to understanding how the court came to accommodate the State and expanded mandamus jurisprudence in the process. In my view, the

calendar was manipulated and it is troubling that the court rewarded it. Rather than limit itself to the issue of whether a state officer followed the law, the court ill-advisedly expanded the mandamus proceedings in an original action to a full-blown preelection constitutionality of statutes challenge. In my view, this was not warranted.

In an original action, *State v. Douglas County*, 18 Neb. 506, 507, 26 N.W. 315, 315 (1886) (*Lytle*), the Nebraska Supreme Court was concerned about the limited time available for thoughtful deliberations, and denied a writ of mandamus seeking to declare a statute unconstitutional on the "eve of an election." The court said the issues are "important," *id.*, but the "presumption is that the [L]egislature has done its duty, and that an act passed by it is not in conflict with the constitution[;] and it is the duty of all ministerial officers to obey it until the act is declared invalid," *id.* at 508, 26 N.W. at 316. The dangers about which *Lytle* warned are evident in the crisis atmosphere and unnecessarily compressed timeline of the instant case.

The Nebraska Supreme Court has followed the *Lytle* holding in original actions. But the per curiam opinion and other opinions invoke *Van Horn v. State*, 46 Neb. 62, 64 N.W. 365 (1895), which involved an appeal from district court, rather than an original action, and permitted an unconstitutionality defense in a mandamus action. The case is distinguishable, and even *Van Horn* warned that ministerial officers who did not obey a statute did so at their "peril." 46 Neb. at 83, 64 N.W. at 372. Further, the members of the court accurately recognize that the *Van Horn* rule is the minority view, see, e.g., *Lockyer v. City and County of San Francisco*, 33 Cal. 4th 1055, 1105 n.34, 95 P.3d 459, 489 n.34 (2004), and that *Van Horn* has been criticized, see, e.g., *Barr v. Watts*, 70 So. 2d 347 (Fla. 1953), but nevertheless, the other opinions softly and conveniently endorse it—at least for now.

I further note that in *State v. State Board of Equalizers*, 84 Fla. 592, 597-98, 94 So. 681, 683 (1922), it was stated:

The right to declare an act unconstitutional is purely a judicial power, and cannot be exercised by the officers of the executive department under the guise of the observance of their oath of office to support the Constitution. It is true that the Supreme Court of Nebraska in *Van Horn v. State*, 46 Neb. 62, 64 N.W. 365, and a few other courts have held that ministerial officers had that right, but there are so many better reasoned cases to the contrary that we will not adopt the Nebraska doctrine.

A higher sense of duty was thus expressed by President Lincoln in his First Inaugural Address to Congress:

"I do suggest that it will be much safer for all, both in official and private stations, to conform to and abide by all those acts which stand unrepealed than to violate any of them trusting to find impunity in having them held to be unconstitutional."

Instead of *Van Horn*, *State ex rel. Wright v. Pepperl*, 221 Neb. 664, 380 N.W.2d 259 (1986), in which this court ordered the public official to publish material in accordance with the statute, is more on point. In *Pepperl*, we said that in a mandamus action the public official "has no right to raise the constitutionality of an act as a defense to his or her failure" to do the act required by statute, thus implicitly overruling *Van Horn*. 221 Neb. at 673, 380 N.W.2d at 265. Similarly, in the instant case, the Secretary of State should and is hereby ordered, inter alia, to publish the registration form in the words of L.B. 20 until relieved of this duty by separate action properly raising constitutionality.

In connection with our review of L.B. 20 and L.B. 53, we recently stated settled principles in *State v. Gnewuch*, 316 Neb. 47, 57-58, 3 N.W.3d 295, 306-07 (2024), as follows:

The principles guiding our review of the constitutionality of a legally enacted statute are well-established. A statute is presumed to be constitutional, and all reasonable doubts are resolved in favor of its constitutionality. The party challenging the constitutionality of a statute

bears the burden to clearly establish the unconstitutionality of a statutory provision. It is not the province of a court to annul a legislative act unless it clearly contravenes the constitution and no other resort remains. A penal statute must be construed so as to meet constitutional requirements if such can reasonably be done. Where a statute is susceptible of two constructions, under one of which the statute is valid while under the other it is unconstitutional or of doubtful validity, that construction which gives it validity should be adopted.

We have long held that state officers are not free to ignore statutory duties and recently stated:

Although an Attorney General's opinion is entitled to substantial weight and is to be respectfully considered, it nonetheless has no controlling authority on the state of the law discussed in it and, standing alone, is not to be regarded as legal precedent or authority of such character as is a judicial decision.

*State ex rel. Peterson v. Shively*, 310 Neb. 1, 10, 963 N.W.2d 508, 516 (2021). See, also, *State v. Coffman*, 213 Neb. 560, 330 N.W.2d 727 (1983).

For a statute to be declared unconstitutional, the Nebraska Constitution requires the vote of five justices of the Nebraska Supreme Court. Neb. Const. art. V, § 2. Only the Nebraska Supreme Court declares statutes unconstitutional. The supermajority requirement is also well known. Patty and Selma at the Department of Motor Vehicles may not be constitutional scholars, but they know that they are expected to follow the law. We recently reiterated that everyone is presumed to know this law and is bound to take notice of it. See, e.g., *Vyhlidal v. Vyhlidal*, 311 Neb. 495, 973 N.W.2d 171 (2022). Do we want to live in a world where every state employee who has a hunch a statute is flawed gets to ignore it? State officers who take the oath to follow the constitution are expected to follow that oath and not disregard their sworn duty to abide by the Nebraska Constitution, including its dictate in article V,

§ 2, that it is the Nebraska Supreme Court, not the Attorney General, who declares laws unconstitutional. I do not agree with the view that under article V, § 2, other officers of the State may also assess the constitutionality of statutes. If they harbor questions about the constitutionality of a particular statute such as the reenfranchisement statutes at issue, rather than refuse to obey the law, there are specific legal mechanisms to be followed to challenge the statute. Waiting to be named as a respondent in a writ of mandamus by an injured party in an original action before the Nebraska Supreme Court was not, until now, one of them. In this case, doing so leads to a loss of public trust in the voting system. Why now? Referring to voter suppression, one federal judge has observed that voting rights have become partisan and the "spigot [of voting rights] is turned on or off depending on whether politicians perceive they will benefit from the expansion or contraction of the electorate." *Hand v. Scott*, 285 F. Supp. 3d 1289, 1310 (N.D. Fla. 2018), *vacated and remanded sub. nom. Hand v. DeSantis*, 946 F. 3d 1272 (11th Cir. 2020). Voting rights in Nebraska were almost contracted today by this court.

The underlying facts are recited in the per curiam opinion. Familiarity therewith is assumed. To understand how this case procedurally nearly swallowed two statutes, I offer the following timeline: L.B. 20, which restored to felons who had served their sentences the right to vote, became effective July 19, 2024. See 2024 Laws, L.B. 20, § 1. But 2 days earlier, the Attorney General issued his opinion, Att'y Gen. Op. No. 24-004 (July 17, 2024), that L.B. 20 and L.B. 53 (effective since 2005) were unconstitutional. Also on July 17, contrary to L.B. 20, the Secretary of State, in reliance on the Attorney General opinion, directed election commissioners to refuse to register felons who had served their sentences and, furthermore, created a voter registration form that violated the language contained in L.B. 20.

Central to my concern about this whole felon voter episode is the fact that the state actors claim that they were impotent

to raise their constitutional challenge earlier. The facts, however, are to the contrary. On July 17, 2024, Neb. Rev. Stat. § 84-215 (Reissue 2014), first enacted in 1977, was in effect and provided in part as follows:

> When the Attorney General issues a written opinion that an act of the Legislature is unconstitutional and any state officer charged with the duty of implementing the act, in reliance on such opinion, refuses to implement the act, the Attorney General shall, within ten working days of the issuance of the opinion, file an action in the appropriate court to determine the validity of the act.

On July 17, 2024, all the statutory and factual predicates of § 84-215 had occurred and the Attorney General's duty to commence a lawsuit to test the constitutionality of L.B. 20 and L.B. 53 attached. The Attorney General did not commence a lawsuit. The net effect was to deter voting and voter registration—one such example being an original petitioner in this case withdrew his request to register and was voluntarily dismissed from this action.

The Attorney General's office is not ignorant about its duties under § 84-215. Indeed, *Hilgers v. Evnen*, docketed as case No. S-24-221, had been commenced by the Attorney General under § 84-215 and is currently pending in this court.

The capable Attorney General's office protested to this court that there was not enough time to commence a lawsuit to test the constitutionality of L.B. 20 and L.B. 53 before the impending repeal of § 84-215 on July 19, 2024. For one thing, this ignores the fact that other remedies remained available, including under Neb. Rev. Stat. § 84-217 (Reissue 2024). For another, a 1996 Attorney General opinion concluded that restoration of voting rights by statute is unconstitutional, so the Attorney General's office has known its position on constitutionality for decades. See Att'y Gen. Op. No. 96023 (Mar. 18, 1996). And for another, the Governor urged the Attorney General and Secretary of State to challenge L.B. 20 months ago.

How could the Attorney General's office not know, since its opinion in 1996, that a statute like L.B. 53 was suspect in 2005 and that L.B. 20 was suspect when it passed in April 2024? Further, in April 2024, the Governor allowed L.B. 20 to become law without his signature. In a letter to the Legislature, the Governor explained that "[t]he Attorney General and Secretary of State have identified significant potential constitutional infirmities regarding the bill." Legislative Journal, 108th Leg., 2d Sess. 1804 (Apr. 17, 2024). The Governor "encourage[d] the Attorney General and the Secretary of State to promptly take such measures as are appropriate in light of the constitutional infirmities." *Id*. at 1805. So the Attorney General's office had at least 3 months from April to July 2024 to prepare its opinion regarding L.B. 20 and nearly 20 years to prepare its opinion regarding L.B. 53, the substance of which the office was aware of since 1996. But it did not "promptly take such measures" as encouraged by the Governor until the clock on § 84-215 was about to run out and the felon reenfranchisement statute was set to begin. The issuance of the Attorney General's opinion on July 17, 2024, was a choice, and respectfully, I am unable to see how it was in service of good government.

Way back in time, on March 18, 1996, the Attorney General's office issued an opinion to "Lisa M. Perry, Administrative Assistant Nebraska Board of Pardons," in connection with Neb. Rev. Stat. §§ 29-2264 (Cum. Supp. 1994) and 83-1,118 (Reissue 1994), in which it opined that the restoration of various civil rights, including the right to serve as a juror, serve as an elector, possess firearms, possess brass or iron knuckles, and hold certain licenses, could only be done by the Board of Pardons. See Att'y Gen. Op. No. 96023 (Mar. 18, 1996). So every day since 1996, and while § 84-215 was simultaneously in effect, the Attorney General's office had the opportunity to test the constitutionality of restoring certain rights by statute. L.B. 53 became effective in 2005, but I am not aware of an opinion of this court or lawsuit challenging it. In sum, despite

the existence of the procedure to do so via § 84-215, and other remedies, the Attorney General waited nearly two decades to challenge L.B. 53 during the election season of 2024.

In this case, felons who had served their sentences and a nonprofit association claiming associational standing, as the petitioners, brought a mandamus action to compel the Secretary of State and election commissioners, as the respondents, to perform their duty under L.B. 20 while it was validly the law of Nebraska. Mandamus is a law action and represents an extraordinary remedy, not a writ of right. *State ex rel. Wagner v. Evnen*, 307 Neb. 142, 948 N.W.2d 244 (2020). Mandamus relief is available if the relator can show (1) that there exists a clear right to the relief sought, (2) that the respondent has a corresponding clear duty to perform the act requested, and (3) that no other plain and adequate remedy is available in the ordinary course of the law. See *id*. In a mandamus action, the burden lies on the party seeking mandamus to show clearly and conclusively that the party is entitled to the particular thing the relator asks, and the respondent is legally obligated to act. See *State ex rel. Parks v. Council of City of Omaha*, 277 Neb. 919, 766 N.W.2d 134 (2009).

In this case, the respondents raise and several members of the court entertain the question of the constitutionality of the reenfranchisement statutes. In considering this question, we are guided by familiar standards. The party challenging the constitutionality of a statute bears the burden to clearly establish the unconstitutionality of a statutory provision. *State ex rel. Peterson v. Shively*, 310 Neb. 1, 963 N.W.2d 508 (2021). A statute is presumed to be constitutional, and all reasonable doubts are resolved in favor of its constitutionality. *Id*. Regarding the presumption of constitutionality, in a recent case, we quoted several excerpts from Thomas M. Cooley's treatise on constitutional law as follows:

> "[W]hen courts are called upon to pronounce the invalidity of an act of legislation, passed with all the forms and ceremonies requisite to give it the force of law, they

will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light upon the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt." . . . "'The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.'"

*Planned Parenthood of the Heartland v. Hilgers, ante* p. 217, 227, 9 N.W.3d 604, 611-12 (2024) (quoting Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union (1868)).

The legal significance of the delay in bringing the constitutionality issue to the attention of this court is illustrated by the concurring opinion of Chief Justice Heavican, which, given time constraints, declines to reach the constitutional issue. This concurrence shows that the compressed timeline is antithetical to thoughtful deliberation on a matter as important as the right to vote.

The majority of decisions have recognized that state officers cannot question the validity of a statute in an original mandamus action such as the instant case. See Annot., Unconstitutionality of Statutes as Defense to Mandamus Proceeding, 129 A.L.R. 941 (1940). The general rule is that "a public officer whose official statutory duties are of a ministerial character cannot question the constitutionality of the statute affecting or prescribing them as a defense in a mandamus proceeding to compel performance thereof." *Id*. at 942. L.B. 20 directs the Secretary of State to print instructional voter registration forms using certain words. This is a ministerial function. See 2024 Neb. Laws, L.B. 20, § 4. The Secretary of State refused to do so. I acknowledge that there are exceptions to the prohibition of raising the constitutionality of a statute as a defense, such as where such performance affects the public

official's interests—the official incurs personal liability or the official is expected to disburse public funds. 129 A.L.R., *supra*. See *Lockyer v. City and County of San Francisco*, 33 Cal. 4th 1055, 95 P.3d 459 (2004). For completeness, I note that we have indicated that a challenge to constitutionality of a statute might be brought in a case where there is no known plaintiff with standing. See *Greene v. State*, 83 Neb. 84, 119 N.W. 6 (1908). But this is not such a case.

Today, the court has expanded mandamus so that mandamus now promotes disobedience to law by state officers and serves as a vehicle for constitutional challenges. We have stated "a system of laws cannot operate on the basis that procedures may be disregarded and parties may agree to try issues not properly before a court." *State ex rel. Wright v. Pepperl*, 221 Neb. 664, 673, 380 N.W.2d 259, 265 (1986). Today's per curiam and other opinions recognizing constitutionality of statute as a defense to mandamus invite public officials who have a duty to enforce the law to make individual decisions to not enforce laws that they think are flawed, to forgo available remedies, and to await being sued by an injured party, and only then challenge the law. This development was avoidable, and I respectfully submit that it is most unfortunate that this court encourages this apparent scheme.

*Substantive Law: Reenfranchisement: Who Does It and What Is It? Statutory Restoration of Individual Civil Rights Were Not Little Pardons, Pardons Light, a Form of Pardon, Remind You of a Pardon, or Partial Pardons When Nebraska Constitution Was Adopted; Separation of Powers Used to Consolidate Power in the Executive Branch.*

Based on the per curiam and other opinions, we find ourselves with greatly expanded mandamus jurisprudence, whereby state officers can ignore statutes they think are flawed and wait to be sued, whereupon they present the constitutionality of a statute as a defense and this court welcomes them. Above, I have voiced my objections to this expanded view of

mandamus proceedings adopted by the court but must proceed to discuss the substantive merits. Below, I discuss who authorizes reenfranchisement and the nature of reenfranchisement. I conclude that the Legislature is one branch that may set terms for reenfranchisement and that reenfranchisement is not a pardon. I therefore conclude that L.B. 20 and L.B. 53 do not violate the separation of powers clause and are constitutional, and I therefore concur with the result of the per curiam opinion to issue the writ of mandamus.

The respondents urge, and many members of the court seem to have agreed, that restoration of voting rights, which is one of many civil rights, is a partial pardon or a form of pardon and that only the Board of Pardons can restore that right. This view ignores the overlap of functions of the three branches and instead treat the issue as a zero-sum game. But their fear that the role of the Board of Pardons in the executive branch will be impaired or diminished by an act of the legislative branch that automatically reenfranchises former felons is unfounded.

We recently observed in *State v. Gnewuch*, 316 Neb. 47, 72-73, 3 N.W.3d 295, 315 (2024), as follows:

> The three branches sometimes overlap in the exercise of their constitutionally delegated powers. This overlap may sometimes result in the three departments having a limited partial agency in or control over the acts of each other. But the constitutional principle of separation of powers demands that in the course of any overlapping exercise of the three branches' powers, no branch may significantly impair the ability of any other in its performance of its essential functions. An analysis of the overlapping exercise of constitutionally delegated powers focuses on the extent to which one branch is prevented from accomplishing its constitutionally assigned functions, balanced against the other branch's need to promote the objectives within its constitutional authority.

Certain of today's opinions seem to reject the existence of an overlapping exercise of power. Indeed, as relevant here, Neb. Const. art. IV, § 13, quoted below, literally anticipates instances of comity between the executive and the legislative branches. For example, the provision provides that in the case of execution for treason, the Governor, an executive officer, can refer the matter to the legislative branch for a possible pardon. The provision also provides that the Board of Parole shall grant parole "under such conditions as may be prescribed by law." Neb. Const. art. IV, § 13. This illustrates that some executive functions under the constitution are not self-executing and are implemented by the Legislature. The limitations of the pardon power are grounded in the constitution itself. This complimentary view of the executive and legislative branches regarding disenfranchisement has existed since *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 18 L. Ed. 366 (1866). There are statutes elsewhere that explicitly state that their provisions do not impair executive powers, such as the original federal parole statute discussed in *Duehay v. Thompson*, 223 F. 305, 306 (9th Cir. 1915) (describing parole statute providing that "'nothing herein contained shall be construed to impair the power of the President of the United States to grant pardon or commutation . . . .' Act June 25, 1910, c. 387, 36 Stat. 819, Fed. Stat. Ann. (Supp. 1912) p. 306 (Comp. St. 1913, §§ 10535-10544)"). Indeed, as an illustration, as recently as March 4, 2024, in *Trump v. Anderson*, 601 U.S. 100, 109-10, 144 S. Ct. 662, 218 L. Ed. 2d 1 (2024), the U.S. Supreme Court recognized that U.S. Const. amend. XIV, § 5, enables Congress to pass "''appropriate legislation''" to "''enforce''" that amendment and "''casts upon Congress the responsibility of seeing to it, for the future, that all the sections of the amendment are carried out in good faith.'"

The constitutional separation of powers provision occasionally generates a dispute between two of the three coequal branches of state government. We have observed that deciding whether a branch has exceeded its authority under the

Nebraska Constitution is a delicate exercise in constitutional interpretation. *In re Petition of Nebraska Community Corr. Council*, 274 Neb. 225, 738 N.W.2d 850 (2007). Looking at the instant case, by failing to focus on the text of the Nebraska Constitution, by relying on dictionary definitions, and by failing to acknowledge the role of the Legislature in restoring voting rights, the respondents and certain opinions of this court ignore the lessons of the original history of voter reenfranchisement and the environment in which article VI, § 2, was adopted. In the end, at the expense of comity, several members of this court would invoke separation of powers in article II, § 1, to consolidate power exclusively in the executive branch when it comes to voting.

To discern the original understanding of the framers and ratifiers of our constitution, see *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 37 N.W.2d 502 (1949), we have said our state constitution must be construed in the light of the history of the commonwealth, the surrounding circumstances, the subject matter under consideration, and the object sought to be attained, as well as the system of laws that were in force in the territory at the time of its adoption. *State ex rel. Johnson v. Chase*, 147 Neb. 758, 25 N.W.2d 1 (1946).

Contrary to the view of other members of this court, in the legal environment in which the Nebraska Constitution was passed, general acts of amnesty such as pardons were not reserved exclusively to the executive branch. Thus, in 1896, the U.S. Supreme Court in *Brown v. Walker*, 161 U.S. 591, 601, 16 S. Ct. 644, 40 L. Ed. 819 (1896), stated:

> The act of Congress in question securing to witnesses immunity from prosecution is virtually an act of general amnesty, and belongs to a class of legislation which is not uncommon either in England, (2 Taylor on Evidence, § 1455, where a large number of similar acts are collated,) or in this country. Although the Constitution vests in the President "power to grant reprieves and pardons for offences against the United States, except in cases

of impeachment," this power has never been held to take from Congress the power to pass acts of general amnesty . . . .

Similar observations regarding overlapping powers were applicable to state government. See Daniel T. Kobil, *The Quality of Mercy Strained: Wrestling the Pardoning Power From the King*, 69 Tex. L. Rev. 569, 615 n.291 (1991) (cases collected). The foregoing admits of a comfort with overlapping authority that I believe applies to this case.

If L.B. 20 and L.B. 53 were declared unconstitutional, reenfranchisement would be placed exclusively in the oblique, discretionary, and lengthy process of the Board of Pardons, which process, according to the record, can only be commenced 10 years after final discharge. In this regard, the courts have been "wary of election schemes that afford discretion" in decisions of reenfranchisement, which can obfuscate intent. See Melissa C. Chiang, *Some Kind of Process For Felon Reenfranchisement*, 72 U. Chi. L. Rev. 1331, 1334 n.14 (2005). For example, in *Shepherd v. Trevino*, 575 F.2d 1110, 1114 (5th Cir. 1978), the court identified the danger of a discretionary process by which officers could "then reenfranchise only those who are, say, white." For completeness, I note that unlike Nebraska, in many states, including Georgia and Connecticut, the power to grant pardons is in a board that does not include elected officials. See Joseph N. Rupcich, *Abusing a Limitless Power: Executive Clemency in Illinois*, 28 S. Ill. U. L.J. 131 (2003).

The following constitutional provisions are relevant to our consideration.

Article IV, § 13, provides:

The Legislature shall provide by law for the establishment of a Board of Parole and the qualifications of its members. Said board, or a majority thereof, shall have power to grant paroles after conviction and judgment, under such conditions as may be prescribed by law, for any offenses committed against the criminal laws of

this state except treason and cases of impeachment. The Governor, Attorney General and Secretary of State, sitting as a board, shall have power to remit fines and forfeitures and to grant respites, reprieves, pardons, or commutations in all cases of conviction for offenses against the laws of the state, except treason and cases of impeachment. The Board of Parole may advise the Governor, Attorney General and Secretary of State on the merits of any application for remission, respite, reprieve, pardon or commutation but such advice shall not be binding on them. The Governor shall have power to suspend the execution of the sentence imposed for treason until the case can be reported to the Legislature at its next session, when the Legislature shall either grant a pardon, or commute the sentence or direct the execution, or grant a further reprieve.

Article VI, § 2, provides: "No person shall be qualified to vote who is non compos mentis, or who has been convicted of treason or felony under the laws of the state or of the United States, unless restored to civil rights."

Article VI, § 2, creates a right to reenfranchisement, but it is not self-executing. The constitution creates a framework, and the vacuum on the front end is filled in by statutes. The "legislative forum" has been recognized as the mechanism to effectuate constitutional provisions regarding reenfranchisement. See, *Richardson v. Ramirez*, 418 U.S. 24, 55, 94 S. Ct. 2655, 41 L. Ed. 2d 551 (1974); *Hopkins v. Watkins*, 108 F. 4th 371 (5th Cir. 2024) (en banc). The Nebraska Constitution establishes the elective franchise as a fundamental right of all qualified voters and states that "there shall be no hindrance or impediment to the right of a qualified voter to exercise the elective franchise." Neb. Const. art. I, § 22. Article III, § 30, of the Nebraska Constitution expressly directs that "[t]he Legislature shall pass all laws necessary to carry into effect the provisions of this constitution."

The members of the court who find L.B. 20 and L.B. 53 unconstitutional seem to recognize that the phrase "unless restored to civil rights" in article VI, § 2, is written in the passive voice, but nevertheless they appear to conclude that the restoration of each of the many civil rights that are restored, e.g., serving as a juror, running for office, possessing a firearm, and voting, is a partial pardon or a form of pardon that can only be granted by the Board of Pardons. The Board of Pardons sure will be busy. This view seems to have also identified reenfranchisement as a form of clemency, which may be a first.

Because of the importance of voting, it is notable that the drafters of the Nebraska Constitution deliberately devoted and isolated a specific and entire section of the constitution to restoration of voting and chose not to provide the mechanism. See Neb. Const. art. VI, § 2. As discussed below, it was not necessary to do so because statutes on the books complete the thought. It is also notable that the drafters knew how to explicitly limit certain rights' restoration to the executive branch, see Neb. Const. art. III, § 13, but chose not to do so when it came to voting.

As I understand it, according to the members of the court who find L.B. 20 and L.B. 53 unconstitutional, all reductions of legal consequences of felony convictions must be done by the Board of Pardons without regard to statutes, and it logically follows that all statutes that prescribe the mechanism for restoration of rights, such as Neb. Rev. Stat. § 83-1,130 (Reissue 2014) pertaining to firearms, are therefore also unconstitutional. *Cf. State v. Illig*, 237 Neb. 598, 467 N.W.2d 375 (1991). See *McCray v. Nebraska State Patrol*, 271 Neb. 1, 710 N.W.2d 300 (2006). Under this view, for example, the Legislature can increase criminal statutory punishments but only the executive Board of Pardons can reduce the punishment. This view overlooks the subtleties of the relationship between the Legislature and the executive branch about which we have previously written. For example, in

*Johnson & Cunningham v. Exon*, 199 Neb. 154, 256 N.W.2d 869 (1977), we upheld a statute, 1975 Neb. Laws, L.B. 567, which changed the allowance of good time credits, both retroactively and prospectively, subject to ex post facto consideration. We reasoned that the mathematical objective formula for good time credits as defined by statute had been earned and were not an individual act of discretion, otherwise known as a pardon, which, of course, belongs to the Board of Pardons. Similarly, the automatic restoration of voting rights is not a pardon-light. A concurring justice in *Exon* described the situation as follows: "There is no valid reason to conjure up a spectre of unconstitutionality to deny to any prisoners the benefits earned by their own good conduct . . . ." 199 Neb. at 161-62, 256 N.W.2d at 873 (McCown, J., concurring in result). Applied to the instant case, there is no good reason to conjure up a separation of powers argument to deny application of a statute that requires no act of discretion or judgment and would deny a nondiscretionary benefit that has been earned. The Legislature made policy decisions reflected in the terms of L.B. 20 and L.B. 53. *Cf. Biddle v. Perovich*, 274 U.S. 480, 47 S. Ct. 664, 71 L. Ed. 1161 (1927) (Justice Holmes stating that granting of pardon is done with public welfare in mind coupled with act of mercy).

Other than a glancing rejection of "'partial pardon'" in *State v. Spady*, 264 Neb. 99, 105, 645 N.W.2d 539, 543 (2002), until today, a "partial pardon" or a form of pardon was not a thing in Nebraska jurisprudence. I do not agree with the view that under the Nebraska Constitution, when adopted, reenfranchisement of voting rights to felons who have completed their sentences was a "partial pardon" that belongs to the Board of Pardons. Because, as noted, the constitution does not specifically identify the mechanism for restoration of voting rights in article VI, § 2, the members of the court who find L.B. 20 and L.B. 53 unconstitutional reason that if restoration of voting can be characterized as a species of "pardon," it will necessarily fit exclusively into the duties

of the executive branch's Board of Pardons listed in article IV, § 13. To get there, one must characterize reenfranchisement as a form of pardon and impose a contemporary view of "partial pardon," i.e., the elimination of a legal consequence of conviction, on the concept of reenfranchisement. I do not agree that restoration of voting rights was a pardon, much less a partial pardon, at the time the Nebraska Constitution was adopted, which, as I have said, is the relevant time period for our analysis as to that which was intended in article VI, § 2, when written.

To sort out the proper view of "partial pardon," we should look to the manner in which the term "partial pardon" was used at the time period during which the Nebraska Constitution was adopted in 1875. I do not believe restoration of voting rights for felons was viewed as a partial pardon in 1875. Contrary to the contemporary view of partial pardon, in the late 1800s a partial pardon was primarily seen as a reduction of penal consequences, but not other legal consequences. See *Blount v. Clarke*, 291 Va. 198, 782 S.E.2d 152 (2016) (collecting cases regarding history of pardons—full, absolute, conditional, or partial—and commutations). The emphasis was on penal consequences, such as reassignment from a chain gang to a work farm. See *id.* In *State ex rel. Attorney-General v. Peters*, 43 Ohio St. 629, 650, 4 N.E. 81, 87 (1885), for example, it was stated that "[a] pardon discharges the individual designated from all or some specified *penal* consequences of his crime. It may be full or partial, absolute or conditional." (Emphasis supplied.) *Peters* relied on a contemporaneous law dictionary, "Bouvier's Law Dict., title, Pardon; 1 Bishop's Cr. Law (6th ed.) sec. 914." 43 Ohio St. at 650, 4 N.E. at 87. The view at the relevant time period was that a partial pardon lessened the punishment but did not encompass collateral disabilities, such as loss of voting rights. *Id.* I believe we should not import contemporary understanding of "partial pardon" and superimpose it over the original understanding of the Nebraska Constitution in 1875, which we are tasked with interpreting

herein. For these reasons, I respectfully disagree with the view that automatic restoration of voting rights is a "partial pardon" or a form of pardon.

Under the view that L.B. 20 and L.B. 53 are unconstitutional, in this area of the law, there is no harmony between the legislative and executive functions of government. But in the search for the answer to the question "who restores civil rights?" that is, who executes the right in article VI, § 2, as I have suggested above, the unconstitutional view discards the context in which this constitutional provision was originally drafted. Although the constitution is supreme, it is incomplete. Both before and after creation of the Nebraska Constitution in 1875, statutory provisions implemented who restores certain civil rights. Statutes written both before and after the adoption of the constitution in 1875 answer the open question—who restores voting rights—dangling in the passive voice in article VI, § 2. As I have stated above, the constitution and statutes should be read in harmony and provide for the potential of overlapping authority over issues of amnesty. With this understanding, the Legislature can statutorily provide for restoration of voting rights for felons.

In 1873, 2 years before the 1875 constitution, the Nebraska statute, Gen. Stat. ch. 58, §§ 258 and 259, pp. 783-84 (1973), provided:

> Sec. 258. Any person sentenced to be punished for any felony (when sentence shall not have been reversed or annulled), shall be deemed incompetent to be an elector, or juror, or to hold any office of honor, trust, or profit, within this state, unless said convict shall receive from the governor of this state a general pardon, under his hand and the seal of the state, in which case said convict shall be restored to his civil rights and privileges: *Provided, however*, That such pardon shall not release such convict from the costs of his conviction.
>
> Sec. 259. Any person who shall have been actually imprisoned in the penitentiary of any other state or

territory of this Union, under sentence for the commission of any crime which, by the laws of this state, is punishable by imprisonment in the penitentiary, shall be deemed incompetent to be an elector or juror, or to hold any office of honor, trust, or profit within this state, unless said convict shall have received a general pardon from the governor of the state in which he may have been imprisoned, agreeably to the laws thereof.

A statute passed in 1875—the same year the constitution was enacted—provided that the Governor "shall, upon receiving certificate of good conduct from the warden and inspectors, immediately issue his warrant for discharge of such convict; said warrant shall in all cases restore the prisoner to civil rights the same as though a pardon had been issued." 1875 Gen. Laws, p. 33, § 3 (later codified as Rev. Stat. § 9234 (1913)).

To restore felons' voting rights, the statutes surrounding the adoption of the constitution contain a variety of mechanisms, such as the warrant of discharge, the pardon, and the restoration of civil rights, which were bestowed by a variety of entities, such as the Board of Pardons and the Governor. It cannot be said that the restoration of voting rights was exclusively by pardon granted by the Board of Pardons at that time.

In 1881, 6 years after the 1875 Constitution, the Nebraska statute, Comp. Stat. ch. XXIV, §§ 258 and 259, p. 707 (1881), provided:

> Sec. 258. [**Criminally disqualified as electors, etc.**]— Any person sentenced to be punished for any felony (when sentence shall not have been reversed or annulled), shall be deemed incompetent to be an elector or juror, or to hold any office of honor, trust or profit within this state, unless said convict shall receive from the governor of this state a general pardon, under his hand and the seal of the state, in which case said convict shall be restored to his civil rights and privileges; *Provided, however,* That such pardon shall not release such convict from the costs of his conviction.

Sec. 259. [**Same.**]—Any person who shall have been actually imprisoned in the penitentiary of any other state or territory of this union, under sentence for the commission of any crime which, by the laws of this state, is punishable by imprisonment in the penitentiary, shall be deemed incompetent to be an elector or juror, or to hold any office of honor, trust or profit within this state, unless said convict shall have received a general pardon from the governor of the state in which he may have been imprisoned, agreeably to the laws thereof.

The statutes in effect in 1919 and 1922, after the constitutional convention in 1919-20, are similar. See Rev. Stat. § 8912 (1913) and Comp. Stat. § 9934 (1922). As a further illustration of the interaction between the branches, more recently in 2002, the Legislature amended § 29-112 (Cum. Supp. 2002) to require the Board of Pardons to clarify its issuance of warrants of discharge. See 2002 Neb. Laws, L.B. 1054, § 3.

Pursuant to the foregoing statutes, which focus on the civil right of voting, and working in concert with the text of the constitutional provision that provides the framework for the restoration of the voting civil right, we learn from the statute that it was the Governor who was to restore the civil right of voting in the 1880s. See, also, *Turley v. State*, 74 Neb. 471, 104 N.W. 934 (1905) (noting in 1905 that custom was for order of discharge to restore all civil rights). For present purposes, the important fact is that the constitution anticipates that statute will assign the mechanism, and it matters not to whom the task is assigned by statute. The 1875 constitution did not provide either a defined or an exclusive mechanism of the voter restoration right it created. If it had, the 1881 and subsequent statutory voter restoration provisions would have been superfluous, and it logically follows that in the view of those who find L.B. 20 and L.B. 53 unconstitutional, 150 years' worth of statutes touching on voting rights are unconstitutional.

Relying on the text of article VI, § 2, I believe the implementation of the restoration of the civil right of voting created thereby was not reserved exclusively to the executive branch by the constitution, and statutes such as L.B. 20 and L.B. 53 do not intrude on the executive branch, nor violate the constitutional separation of powers. The Legislature did not exceed its authority when it passed L.B. 20 and L.B. 53, and I am not fearful that other future statutes, which do not share the peculiar language and exigencies of article VI, § 2, will encroach on the power of the Board of Pardons. I would hold that, when passed, L.B. 20 and L.B. 53 were constitutional, and therefore, I agree with the result of the per curiam opinion that the writ of mandamus should issue.

## CONCLUSION

In just one case, the court has inflicted damage to Nebraska procedure and threatens to do so as to substance in the future.

As to procedure: By expanding the unconstitutionality of a statute as an available defense to mandamus actions, the court enables an apparent scheme whereby the state actors' challenge to the felon reenfranchisement statutes, L.B. 20 and L.B. 53, was permitted to be delayed until voting season and inevitably caused voting disorder. The executive effort to nullify voting rights legislation on the eve of an election is problematic. Just barely, the objective of the apparent scheme was not achieved and the true separation of powers story in this case is the preservation of the judiciary's power, including the power to declare what statutes are unconstitutional. And as to the future, the court has now invited all state employees to ignore the laws they think are flawed and see if they get sued. The story is still being written.

As to substance: The obvious issue in this case is a constitutional challenge to L.B. 20 and L.B. 53, which restore voting rights to felons who have completed their sentences. The challenge is based on a claim that the legislative branch has encroached on the executive branch. As we have said, to prove

a statute invalid, the challenge must overcome the presumption of constitutionality and nullity and the invalidity of the statute must be beyond a reasonable doubt such that the judge feels a clear and strong conviction of the statute's incompatibility with the constitution. I have not been so convinced by the respondents, nor has the struggling language of the opinions finding L.B. 20 and L.B. 53 unconstitutional convinced me otherwise.

Article VI, § 2, grants the right of reenfranchisement but not the mechanism; it is not self-executing. For the reasons explained above, including that statutes from immediately before and after the Nebraska Constitution was adopted in 1875, and although a full pardon is the task of the Board of Pardons located in the executive branch, the mechanism of restoration of voting rights has always been a province of the legislative forum. L.B. 20 and L.B. 53 represent the policy decision of the Legislature, but others on the court have concluded instead that restoration of voting rights belongs exclusively to the Board of Pardons (composed of the elected Governor, Attorney General, and Secretary of State), which exercises its discretion as to who gets to vote. Under opinions that would find L.B. 20 and L.B. 53 unconstitutional, the right to vote of persons who registered to vote under L.B. 53 would be effectively taken away. Rather than upholding separation of powers, the respondents' approach would consolidate power in the executive branch and thereby diminish power in the previously coequal legislative and judicial branches. Under the view urged by the respondents and the members of the court who would find L.B. 20 and L.B. 53 unconstitutional, the elected officials would choose their voters instead of the other way around.

Funke, J., dissenting.

I agree with my colleagues that there is no issue of justiciability here, because the parties' joint stipulated facts establish standing for the individual relators, Gregory Spung

and Jeremy Jonak. I write separately in respectful dissent to explain why I would find the reenfranchisement provisions of 2024 Neb. Laws, L.B. 20, are unconstitutional.

Before setting forth my reasons for taking this view, however, I would observe that all members of this court are cognizant of the importance of the right to vote and the implications of our decision upon the potential ability of Nebraskans to exercise that right.[1] However, the issue before us does not hinge upon our views as to the merits of reenfranchisement. Instead, it involves a question of constitutional interpretation. "A constitution represents the supreme written will of the people regarding the framework for their government."[2] "The meaning of the Constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it."[3] Courts are not at liberty to construe into the constitution new principles that did not exist at the time of its adoption.[4] In other words, this court is bound to uphold the Nebraska Constitution as adopted by our fellow Nebraskans.

## CLAIM OF UNCONSTITUTIONALITY MAY BE RAISED IN MANDAMUS PROCEEDING

The relators suggest that the court should issue a writ of mandamus without evaluating the argument of the Nebraska Secretary of State (Secretary) that L.B. 20 is unconstitutional. In support of this argument, the relators argue that the Secretary "has violated the separation-of-powers by usurping

---

[1] See, e.g., *Pony Lake Sch. Dist. v. State Committee for Reorg.*, 271 Neb. 173, 188, 710 N.W.2d 609, 623 (2006) ("the fundamental right to vote in this country is the right to participate in representative government").

[2] *State ex rel. Johnson v. Gale*, 273 Neb. 889, 896, 734 N.W.2d 290, 298 (2007).

[3] *First Trust. Co. v. Smith*, 134 Neb. 84, 104, 277 N.W.2d 762, 777 (1938) (citing 1 Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union (8th ed. 1927)).

[4] *First Trust Co., supra* note 3.

the role of the judiciary and declaring the [reenfranchisement statutes] unconstitutional."[5] They contend that if the Secretary concluded that the reenfranchisement statutes were unconstitutional, he should have initiated a legal action to challenge their constitutionality, rather than declining to implement them. They assert that the Secretary "should not receive any benefit from taking an unlawful shortcut."[6]

However, to the extent the relators argue that the Secretary should not be permitted to assert the unconstitutionality of a statute in a mandamus proceeding, long-established Nebraska precedent is not on their side. More than a century ago, this court was confronted with an argument much like the one made by the relators here. In *Van Horn v. State*,[7] the relators sought a writ of mandamus compelling county supervisors to perform certain duties required by statute regarding township organization. The supervisors refused on the ground that they believed the statute was unconstitutional. The relators argued that mandamus should issue on the ground that ministerial officers like the county supervisors could not assert that a statute that purports to impose a duty upon them is unconstitutional.

This court rejected the relators' argument in *Van Horn*. With citation to *Marbury v. Madison*,[8] the court began by observing that the "constitution is the supreme law, binding upon the legislature, as well as upon every citizen, and that no act of the legislature repugnant to the constitution can become a law for any purpose."[9] Given the primacy of the constitution, the court concluded that "[m]inisterial officers are . . . not bound to obey an unconstitutional statute, and the courts sworn to support the constitution will not by mandamus

---

[5] Brief for relators at 26.

[6] *Id.*

[7] *Van Horn v. State*, 46 Neb. 62, 64 N.W. 365 (1895).

[8] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803).

[9] *Van Horn, supra* note 7, 46 Neb. at 83, 64 N.W. at 372.

compel them to do so."[10] Instead, the court held that it is "a complete answer to an application for [a writ of mandamus] that the statute seeking to impose the duty is violative of the constitution."[11] To be sure, the court cautioned that a mere doubt about the constitutionality of a statute would not justify an officer in not following it and that officers who refuse to follow statutes "disregard them at their peril."[12] But the court declared that "when they do disregard them, and the question is presented to the court as to whether or not obedience will be compelled, the question of the validity of the act is presented, and obedience will not be compelled if the act is unconstitutional."[13]

The relators argue it "drastically overreads *Van Horn*" to conclude that it permits a respondent in a mandamus action to raise the unconstitutionality of a statute as a defense.[14] They argue that much more recently, in *State ex rel. Wright v. Pepperl*,[15] this court backed away from *Van Horn*. The relators also claim that permitting ministerial officers to raise the unconstitutionality of statutes imposing a duty upon them in mandamus actions conflicts with other principles of our law.

I would take a different view. First, *Pepperl* can be seen to recede from the rule announced in *Van Horn* only if parts of that opinion are read out of context. In *Pepperl*, this court did hold that the respondent in that mandamus action, the state's Revisor of Statutes (Revisor), could not inject the constitutionality of a statute into the mandamus action, because "the power to declare an act of the Legislature unconstitutional is a judicial power reserved solely to the courts and not to

---

[10] *Id*. at 83, 64 N.W. at 372 (emphasis omitted).

[11] *Id*.

[12] *Id*.

[13] *Id*.

[14] Reply brief for relators at 14.

[15] *State ex rel. Wright v. Pepperl*, 221 Neb. 664, 380 N.W.2d 259 (1986).

any other public official."[16] However, that statement was in response to the Revisor's reliance on a statute that recognized an exception to the Revisor's general duty to print and publish laws enacted by the Legislature. That exception allowed the Revisor to remove statutory language "which the Supreme Court has held to be unconstitutional."[17] When the Revisor removed statutory language that this court had not yet found unconstitutional and faced mandamus proceedings, this court would not permit the Revisor to litigate the constitutionality of that statutory language in the mandamus proceedings. But in doing so, this court expressly found *Van Horn* did not apply, because the duty at issue in *Pepperl* was the duty to print and publish the laws passed by the Legislature, and the Revisor did not contend that the statute imposing that duty was unconstitutional. Here, in contrast, the Secretary is contending that L.B. 20, the statute the relators contend imposes a duty, is unconstitutional.

I also disagree with the relators' contention that if *Van Horn* means what it says, it cannot be squared with other legal principles of law. Here, the relators invoke the provision of the Nebraska Constitution providing that "[n]o legislative act shall be held unconstitutional except by the concurrence of five judges,"[18] as well as prior statements of this court that an opinion of Nebraska's Attorney General, although entitled to "substantial weight" and respectful consideration, "has no controlling authority on the state of law discussed in it, and standing alone is not to be regarded as legal precedent or authority of such character as is a judicial decision."[19] The relators argue that if the Secretary can raise the unconstitutionality of the reenfranchisement statutes in this mandamus

---

[16] *Id*. at 671, 380 N.W.2d at 264.

[17] See Neb. Rev. Stat. § 49-705(2) (Reissue 1984).

[18] Neb. Const. art. V, § 2.

[19] *State v. Coffman*, 213 Neb. 560, 561, 330 N.W.2d 727, 728 (1983).

proceeding, the constitution's supermajority provision and our observations regarding the status of opinions of the Attorney General mean nothing. Again, I disagree.

The supermajority requirement of article V, § 2, imposes a rule of decision for this court when it determines constitutional questions. I do not understand it to speak to whether other officers of the state may also assess the constitutionality of statutes they are directed to follow.[20] As for the relators' reliance on language regarding the weight to be afforded to Attorney General opinions, that language merely recognizes the settled principle that an opinion of the Attorney General is not a judicial decision and does not have the same character and effect as a judicial opinion.

Admittedly, *Van Horn* endorses what has been described as a minority rule,[21] and its reasoning has been criticized.[22] However, whatever merits the criticisms of *Van Horn* may generally have, I see no basis not to follow the *Van Horn* rule here. Nebraska statutes provide that the Secretary "shall decide disputed points of election law" and that such decisions "shall have the force of law until changed by the courts."[23] In this case, the Secretary, in reliance on an opinion from the Attorney General, resolved such a question of election law, determining that the reenfranchisement statutes were unconstitutional. Even some jurisdictions that generally do not allow ministerial officers to raise the unconstitutionality of a statute in a mandamus action have recognized an exception when a state officer relies on the opinion of a state's

---

[20] Cf. *Freytag v. Commissioner*, 501 U.S. 868, 906, 111 S. Ct. 2631, 115 L. Ed. 2d 764 (1991) (Scalia, J., concurring; O'Connor, Kennedy, and Souter, JJ., join) (recognizing President's "power to veto encroaching laws . . . or even to disregard them when they are unconstitutional).

[21] See, e.g., *Lockyer v. City and County of San Francisco*, 33 Cal. 4th 1055, 95 P.3d 459 (2004).

[22] See, e.g., *Barr v. Watts*, 70 So. 2d 347 (Fla. 1953).

[23] See Neb. Rev. Stat. § 32-201 (Reissue 2016).

attorney general.[24] Furthermore, given that § 32-201 directs the Secretary to "decide disputed points of election law" and provides that such decisions, until changed by the courts, "have the force of law," I see no basis to prohibit the Secretary from asserting the unconstitutionality of a statute in this mandamus proceeding.

As to any suggestion that *Pepperl* and *State v. Douglas County* (*Lytle*)[25] could be construed to mean that Nebraska law previously did not allow parties to raise the constitutionality of statutes in original action mandamus proceedings, *Pepperl* cannot be read to establish such a proposition. Neither can *Lytle*.

In *Lytle*, a party filed an application for a writ of mandamus on October 29, 1885, asking the court to compel an election to be held less than 1 week later. We declined to reach the constitutional question presented, stating that the "case was submitted, practically without argument," and that the court could not "dispose of the case in this summary manner."[26] The circumstances here are different. This case commenced several months before an election, we expedited briefing and argument, and the briefing and argument we received was thorough and thoughtful. Oral arguments were held in late August 2024, and a summary decision was not required.

Furthermore, this court cited *Lytle* in *Van Horn*, where we distinguished it, not on the grounds that it was an original action, but on the grounds that it was "submitted on the eve of the election" and "practically without argument."[27]

Questions regarding the timing of the Secretary's and the Attorney General's actions concerning the reenfranchisement

---

[24] See, e.g., *State ex rel. Equality Sav. & Bldg. Assn. v. Brown*, 334 Mo. 781, 68 S.W.2d 55 (1934).

[25] *State v. Douglas County*, 18 Neb. 506, 26 N.W. 315 (1886).

[26] *Id*. at 507, 26 N.W. at 315.

[27] *Van Horn, supra* note 7, 46 Neb. at 84, 64 N.W. at 372.

statutes have also been raised. Even assuming the Secretary or the Attorney General could have challenged those statutes at some earlier time, I do not see the legal relevance.[28]

## CONSTITUTIONALITY OF L.B. 20

Turning next to the question of L.B. 20's constitutionality, everyone agrees that article VI, § 2, of the Nebraska Constitution generally prohibits the individual relators from voting. Everyone also agrees that notwithstanding that prohibition, the individual relators would be eligible to vote if "restored to civil rights." The dispute arises over how one may be "restored to civil rights."

The Secretary argues that the individual relators can be restored to civil rights only through the action of Nebraska's Board of Pardons. He also argues that one is "restored to civil rights" for purposes of article VI, § 2, only if multiple civil rights are restored. Because L.B. 20 purports to restore the right to vote without action of the Board of Pardons and without restoring other civil rights, the Secretary argues it is unconstitutional.

The relators disagree. Although they agree with the Secretary that civil rights can be restored by the Board of Pardons, they disagree that only the Board of Pardons can restore civil rights. They contend that the Legislature may constitutionally restore civil rights and restore the right to vote independently of other civil rights.

Ultimately, I would agree with the Secretary's argument that the Legislature lacks the power to restore the voting rights of the individual relators. The Secretary's argument is based on several premises. First, the Secretary contends that an action that restores a civil right is, in essence, an exercise of the

---

[28] Cf. *INS v. Chadha*, 462 U.S. 919, 103 S. Ct. 2764, 77 L. Ed. 2d 317 (1983) (finding "legislative veto" to be unconstitutional, even though it had been provided for in at least 56 statutes, some of which were enacted 30 years earlier).

pardon power. Second, he points out that the constitution gives the power to grant pardons to the Board of Pardons. And, finally, he submits that because the power to grant pardons is given to the Board of Pardons and because an action that restores civil rights is, in essence, an exercise of the pardon power, the separation of powers clause of the constitution prohibits the Legislature from exercising that power.

In determining that the restoration of civil rights is essentially an exercise of the pardon power, I would look to what a pardon is and does. From the era when the relevant constitutional provisions were enacted and continuing through the present, a consensus has existed as to the nature and effect of a pardon. In 1866, in *Ex parte Garland*,[29] the U.S. Supreme Court explained that a pardon "removes the penalties and disabilities [of the offender's conviction], and restores him to all his civil rights." In 1875, the U.S. Supreme Court wrote that "[i]t is of the very essence of a pardon that it releases the offender from the consequences of his offence."[30] A contemporaneous criminal law treatise similarly stated that "[t]he effect of a full pardon is to absolve the party from all the consequences of his crime, and of his conviction, direct and collateral; including the punishment, whether of imprisonment, pecuniary penalty, or whatever else the law has provided."[31] Pardons were thus understood to free the offender from any punishment for a crime and to eliminate any other legal consequences of the conviction, such as the loss of civil rights.

This understanding of pardons has persisted. In case after case from *Ex parte Garland* to the present, this court and others have understood full pardons to cut off punishment and

---

[29] *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 380, 18 L. Ed. 366, 371 (1866).

[30] *Osborn v. United States*, 91 U.S. 474, 477, 23 L. Ed. 388, 389 (1875).

[31] Joel Prentiss Bishop, Commentaries on the Criminal Law § 713 at 731 (2d ed. 1858).

eliminate other legal consequences of the conviction, such as the loss of civil rights occasioned by the conviction.[32]

Although restoration of voting rights alone would not relieve an offender from punishment for his or her conviction, it does not follow that an act restoring voting rights lacks the defining features of a pardon. Pardons can be (and commonly are) granted after the offender has completed the punishment imposed for the crime.[33] Under those circumstances, pardons do not relieve the offender of any punishment; they only relieve the offender of other legal consequences arising as a result of the conviction.[34] Accordingly, because many pardons do not exempt the offender from punishment, one cannot reasonably conclude that the pardon power has not been exercised merely because an offender has not been spared from punishment for the conviction.

Nor can one conclude that the pardon power has not been exercised merely because only some legal consequences of a conviction have been nullified. This is so because an act that eliminates only some legal consequences of a conviction is still a species of pardon—a partial pardon. Just as there was and is a well-accepted understanding of what a full pardon is and does, so too there was and is a well-accepted understanding of partial pardons. Black's Law Dictionary defines "partial pardon" as a "pardon that exonerates the offender from

---

[32] See, e.g., *Kocontes v. McQuaid*, 279 Neb. 335, 778 N.W.2d 410 (2010), *abrogated on other grounds, Doe v. Board of Regents*, 280 Neb. 492, 788 N.W.2d 264 (2010); *U.S. v. Flynn*, 507 F. Supp. 3d 116 (D.D.C. 2020); *U.S. v. McMichael*, 358 F. Supp. 2d 644 (E.D. Mich. 2005); *People ex rel. Madigan v. Snyder*, 208 Ill. 2d 457, 804 N.E.2d 546, 281 Ill. Dec. 581 (2004); *Marsh v. Garwood*, 65 So. 2d 15 (Fla. 1953); *Slater v. Olson*, 230 Iowa 1005, 299 N.W. 879 (1941); *People v. Biggs*, 9 Cal. 2d 508, 71 P.2d 214 (1937); *Ex Parte Crisler*, 159 Miss. 247, 132 So. 103 (1931).

[33] See Daniel T. Kobil, *The Quality of Mercy Strained: Wresting the Pardoning Power from the King*, 69 Tex. L. Rev. 569 (1991).

[34] See, e.g., *Marsh, supra* note 32. See, also, *Hunnicutt v. State*, 18 Tex. App. 498 (1885); *State v. Blaisdell*, 33 N.H. 388 (1856).

some but not all of the punishment or legal consequences of a crime."[35] Many courts have recognized this definition of a partial pardon.[36]

A pardoning authority's power to grant a partial pardon flows from its authority to grant pardons.[37] The Nebraska Legislature appeared to recognize that the Board of Pardons had the power to grant partial pardons when it amended § 29-112 in 2002 to direct the Board of Pardons to "enumerate[] or limit[]" the civil rights it was restoring in a warrant of discharge.[38]

In short, I would find that because partial pardons are a type of pardon and because the restoration of voting rights eliminates a legal consequence of a conviction, the restoration of voting rights has the defining features of pardon.

I would also find that insofar as an act restoring civil rights has a defining feature of a pardon, and the Nebraska Constitution grants the power to issue pardons to the Board of Pardons, the right to vote of those convicted of felonies under Nebraska law cannot be restored automatically by statute, but instead must be restored through the Board of Pardons. It is here that the express separation of powers provision found in article II, § 1, of the Nebraska Constitution becomes relevant. That section provides in relevant part that "no person or collection of persons being one of these departments shall exercise any power properly belonging to either of the others except as expressly directed or permitted in this Constitution."

[35] Black's Law Dictionary 1336 (12th ed. 2024).

[36] See, *People ex rel. Madigan, supra* note 32; *Anderson v. Com.*, 107 S.W.3d 193 (Ky. 2003). See, also, *United States v. Barrett*, 504 F.2d 629 (6th Cir. 1974); *P. H. Warren v. The State*, 127 Tex. Crim. 71, 74 S.W.2d 1006 (Tex. Crim. App. 1934).

[37] See, e.g., *Anderson, supra* note 36; *State v. Hildebrand*, 25 N.J. Super. 82, 95 A.2d 488 (1953); *In re Cummins*, 20 Haw. 518 (1911); *Lee v. Murphy*, 63 Va. (22 Gratt.) 789 (1872).

[38] 2002 Neb. Laws, L.B. 1054, §§ 3 and 4.

In several cases, we have held that legislation that authorizes another branch to exercise a power granted to the Board of Pardons violates article II, § 1. In *State v. Philipps*,[39] the State challenged the constitutionality of a statute permitting those serving a sentence for a conviction to petition the court for a reduced sentence after the sentence was imposed. We held that the statute was unconstitutional because it allowed the judiciary to exercise the power of commutation.

The offender in *Philipps* pointed to cases from other jurisdictions in which courts held that the judicial reduction of a sentence was distinct from the power of pardon or commutation. However, we declined to rely on those cases because they engaged in circular reasoning. As we explained, "[D]etermining whether an act is one of commutation on the basis of who performs it begs the question."[40] Instead, we concluded that the statute violated the separation of powers because "the essence of commutation is the substitution of a milder punishment,"[41] and the statute allowed the courts to substitute a milder punishment. We relied on the same reasoning in *State v. Jones*[42] and *State v. Bainbridge*[43] to hold that other statutes permitting courts to substitute milder punishments for the sentence initially imposed were unconstitutional.

Applying these cases here, I would find that L.B. 20 runs afoul of the separation of powers provision because it "does the very thing which defines" one of the actions the Board of Pardons is empowered to take by article IV, § 13.[44] It purports to restore offenders' rights to vote that they have lost as a result of a felony conviction.

---

[39] *State v. Philipps*, 246 Neb. 610, 521 N.W.2d 913 (1994).

[40] *Id.* at 615, 521 N.W.2d at 916.

[41] *Id*. at 615, 521 N.W.2d at 916-17.

[42] *State v. Jones*, 248 Neb. 117, 532 N.W.2d 293 (1995).

[43] *State v. Bainbridge*, 249 Neb. 260, 543 N.W.2d 154 (1996).

[44] *Philipps, supra* note 39, 246 Neb. at 616, 521 N.W.2d at 917.

The relators do not dispute that the Board of Pardons has the power to restore voting rights through the pardon power. In their view, however, both the Board of Pardons and the Legislature can restore voting rights. Several reasons are offered for this, but I am not persuaded that the power to restore voting rights overlaps in this way.

One argument raised in favor of the relators' position is that although article VI, § 2, provides for the possible restoration of voter rights of those convicted of felonies, it does not specify who may restore those rights. It is further contended that there is an absence of evidence that article VI, § 2, was originally understood to permit the restoration of civil rights only through the pardoning authority. Respectfully, I do not believe such analysis considers the entirety of the Secretary's argument. The fact that article VI, § 2, does not identify who may restore voter rights does not, in and of itself, mean there is no constitutional problem. Any restoration of voter rights contemplated by article VI, § 2, must comply with other constitutional provisions, including the article II, § 1, prohibition on one branch exercising powers that have been granted to another.[45] And, for reasons explained above, I would find that L.B. 20 violates that prohibition.

For similar reasons, I am unpersuaded by the argument that article VI, § 2, is not self-executing, and the Legislature is thus free to pass legislation to bring that constitutional provision into effect. I question the conclusion that article VI, § 2, is not self-executing. We have previously said that "'[c]onstitutional provisions are self-executing when there is a manifest intention that they should go into immediate effect, and no ancillary legislation is necessary to the enjoyment of a right given, or the enforcement of a duty imposed.'"[46] Given

---

[45] See *State v. Gnewuch*, 316 Neb. 47, 3 N.W.3d 295 (2024) (Papik, J., dissenting; Funke and Freudenberg, JJ., join).

[46] *Wilfong v. Omaha & C. B. Street R. Co.*, 129 Neb. 600, 608, 262 N.W.2d 537, 541 (1935).

the recognition that pardons restore the civil rights of the recipient, a gubernatorial pardon in 1875 would have had the effect of restoring the voting rights of an individual convicted of a felony even absent legislation so providing. Legislation was thus not necessary for article VI, § 2, to go into effect. Moreover, even when a constitutional provision is not self-executing, the Legislature cannot pass legislation that violates another constitutional provision.[47] And for the reasons set forth above, it is my view that L.B. 20 violates the separation of powers provision set forth in article II, § 1.

To be sure, there is one constitutional provision that expressly authorizes the Legislature to do some things in the clemency arena. Specifically, article IV, § 13, expressly provides a role for the Legislature in setting conditions under which parole may be granted and in issuing pardons for convictions for treason. However, we have previously explained that the "conditions clause" of article IV, § 13, only permits the Legislature to place conditions on when a committed offender is eligible for parole.[48] But "once eligible for parole, the Board [of Parole] alone has authority to grant parole—the Legislature has no power over the decision whether to grant release on parole."[49]

The history of statutes regarding civil rights restoration also does not persuade me that the Legislature may constitutionally restore voting rights of those convicted of felonies. For a number of years, Nebraska statutes provided that voting rights of those convicted of felonies could be restored only through the pardoning authority. Although such statutes may have declared what was already the law, they do not, in my view, demonstrate an understanding that the Legislature could unilaterally restore civil rights. It is true that, decades after the Nebraska Constitution was adopted, the Legislature

---

[47] See *Peterson v. Hancock*, 155 Neb. 801, 54 N.W.2d 85 (1952).

[48] *Adams v. State*, 293 Neb. 612, 619, 879 N.W.2d 18, 23 (2016).

[49] *Id*.

enacted statutes concerning restoration of the right to vote that appear to be inconsistent with the view that the Board of Pardons has the exclusive authority to restore voting rights. However, those statutes shed little light on the question before us. On the one hand, the statutes seem to recognize that the clemency powers of the Board of Pardons include the power to restore voting rights. But to the extent those statutes attempted to require the Board of Pardons to grant or deny clemency, they too appear to have been unconstitutional.[50]

I also disagree with any suggestion that the separation of powers analysis in this case could be resolved by application of a four-part balancing test we have occasionally used to determine whether, in a situation in which branches of government have "overlapping" powers, one branch is "significantly impair[ing] the ability of any other in its performance of its essential functions."[51] This is not a case in which the Secretary is contending that the Legislature is merely impairing the Board of Pardons' functions. Rather, the Secretary contends that the Legislature has exercised a power given to the Board of Pardons. In that scenario, article II, § 1, does not contemplate balancing. It prohibits one branch from exercising the powers of another unless the constitution expressly permits or directs the exercise of that power.

Consistent with that understanding, our decisions in *Bainbridge*,[52] *Jones*,[53] and *Philipps*[54] did not use a balancing test to determine whether the Legislature's passage of statutes authorizing the judicial branch to substitute milder punishment for that initially imposed impaired the function of the Board of Pardons; the fact that the statutes at issue authorized

---

[50] See, e.g., *State v. Castaneda*, 287 Neb. 289, 842 N.W.2d 740 (2014).

[51] *State ex rel. Veskrna v. Steel*, 296 Neb. 581, 598, 894 N.W.2d 788, 800 (2017).

[52] *Bainbridge, supra* note 43.

[53] *Jones, supra* note 42.

[54] *Philipps, supra* note 39.

the judiciary to do "the very thing which defines an act of commutation" was sufficient to find unconstitutionality.[55]

The relators also contend that the Secretary's constitutional argument is squarely foreclosed by one sentence in *Ways v. Shively*.[56] In *Ways*, a person who had been convicted of a felony and had completed his sentence sought a writ of mandamus compelling an election commissioner to permit him to register to vote. We noted that under article VI, § 2, the petitioner had lost his right to vote. We then stated that "[r]estoration of the right to vote is implemented through statute."[57] The relators point to this language and assert that it conclusively establishes that the Legislature may restore felons' voting rights via statute. A closer read of *Ways* reveals otherwise.

At the time *Ways* was decided, § 29-112 (Reissue 1995) provided that persons convicted of felonies could not vote unless and until they received a warrant of discharge from the Board of Pardons. The petitioner in *Ways* had not received a warrant of discharge from the Board of Pardons, but had received a certificate of discharge from the corrections department after he completed his sentence. The petitioner argued that he was entitled to register to vote because other statutory language in effect at the time directed that a certificate of discharge "shall restore the civil rights of the offender."[58] We applied the familiar rule that when statutes are in conflict, the more specific statute controls the more general, and found that § 29-112 was the more specific statute. Thus, our decision in *Ways* did not determine that the Legislature could constitutionally provide for the automatic restoration of a felon's right to vote. At that time, the Legislature had not yet passed a statute providing for automatic restoration. I understand

---

[55] *Id.* at 616, 521 N.W.2d at 917. See, also, *State v. Stephens*, 663 S.W.3d 45 (Tex. Crim. App. 2021).

[56] *Ways v. Shively*, 264 Neb. 250, 646 N.W.2d 621 (2002).

[57] *Id.* at 255, 646 N.W.2d at 626.

[58] Neb. Rev. Stat. § 83-1,118(5) (Reissue 1999).

the language in *Ways* to recognize the existence of a statute addressing restoration of the right to vote, not to assess the constitutionality of an as-yet-to-be-enacted statute.

The relators similarly argue that this case is controlled by *State v. Spady*,[59] another decision we issued the same year as *Ways*. In *Spady*, an individual who had successfully completed a term of probation for a misdemeanor conviction petitioned the county court under Neb. Rev. Stat. § 29-2264 (Cum. Supp. 2000) for an order setting aside the conviction. The county court denied the petition, finding that § 29-2264 was unconstitutional. The district court affirmed, finding that § 29-2264 authorized the judiciary to issue a "pardon or a 'partial pardon.'"[60] The petitioner appealed.

On appeal, we considered in *Spady* whether the relief sought amounted to a pardon or partial pardon. We cited cases from this court and others, as well as Black's Law Dictionary, all of which generally recognized that a pardon is an act relieving an offender from punishment or other legal consequences of a crime. We then concluded that the setting aside of a conviction under the statute did not amount to a pardon. We noted that successful petitioners under the statute are not "exempted from punishment" and that the relief was available only for those "placed on probation or . . . sentenced to a fine only."[61] We also observed that, under the statute, even if a conviction was set aside, it could still be used for some purposes and thus the setting aside of a conviction did "not nullify all of the legal consequences of the crime committed because certain civil disabilities enumerated above are not restored, as occurs when a pardon is granted."[62] As for the district court's conclusion that the setting aside of the conviction amounted to

---

[59] *State v. Spady*, 264 Neb. 99, 645 N.W.2d 539 (2002).

[60] *Id*. at 101, 264 Neb. at 541.

[61] *Id.* at 104, 645 N.W.2d at 543.

[62] *Id.* at 105, 645 N.W.2d at 543.

a partial pardon, we disagreed, stating only that "certain civil disabilities are exempted from restoration."[63]

The relators argue that *Spady* stands for the proposition that the legislative and judicial branches may nullify legal consequences arising as a result of a criminal conviction so long as they do not spare the offender from punishment or nullify all the legal consequences of a crime. To the extent *Spady* can be so read, it is untenable. First, as I explained above, because pardons are often granted after the offender has completed the punishment imposed for the crime, many pardons do not spare the offender from any punishment.

Moreover, to the extent *Spady* can be read to say that the legislative and judicial branches do not usurp the pardon power so long as their actions nullify only *some* legal consequences of a conviction, that conclusion also cannot withstand scrutiny. The opinion in *Spady* stated that the setting aside of a conviction under § 29-2264 did not amount to a partial pardon because "certain civil disabilities are exempted from restoration."[64] But, as I have discussed in this opinion, a partial pardon is just that—an act that spares the offender from just some of the legal consequences of a crime.

Perhaps the result in *Spady* can be defended on the grounds that the civil disabilities § 29-2264 nullifies were imposed by the Legislature, and thus, the Legislature retained the power to nullify them or allow the judiciary to do so. However, even assuming this were the case, that would be of no assistance to the relators here because the disqualification of individuals convicted of felonies from voting arises from the constitution, and not from a statute.

The relators further rely on authority from outside of Nebraska. They contend that in many states, statutes provide for the automatic restoration of voting rights for those convicted of felonies, while executive officials retain the authority

---

[63] *Id.* at 105, 645 N.W.2d at 544.

[64] *Id.*

to also restore voting and other rights through the power to pardon. However, the relators have not directed us to a case in one of those states in which a court rejected an argument like the Secretary makes here.

In fact, authority in one of the other states that the relators invoke supports the Secretary's position. The relators identify Florida as a state in which a statute provides that the voting rights of those convicted of some felonies are restored upon completion of their sentences. Such a statute does exist,[65] but it expressly refers to a provision in the Florida Constitution that provides that, for certain felony offenses, voting rights are restored upon completion of the offender's sentence.[66]

Not only is there an express provision in the Florida Constitution providing for automatic restoration of voting rights upon completion of a sentence for some felonies, but this provision came into being as a result of the Florida Supreme Court's determination that a prior statute providing for automatic restoration of voting rights was unconstitutional.[67] The Florida Supreme Court concluded that because the Florida Constitution granted to executive branch officials the power to pardon and restore civil rights, the Legislature could not constitutionally restore felons' right to vote.[68] And although the Florida Constitution provided that the pardoning authorities had the power to both "grant full or conditional pardons" and "restore civil rights,"[69] the Florida Supreme Court decision is nonetheless instructive in this case. Although the Nebraska Constitution does not include an express provision authorizing the Board of Pardons to restore civil rights, it does authorize the Board of Pardons to issue pardons, and, as

---

[65] See Fla. Stat. Annot. § 98.0751 (West Cum. Supp. 2024).

[66] See Fla. Const. art. VI, § 4.

[67] See *In re Advisory Opinion of Governor Civil Rights*, 306 So. 2d 520 (Fla. 1975).

[68] *Id.*

[69] Fla. Const. art. IV, § 8.

discussed, it is a defining feature of a pardon that it restores civil rights of the pardoned individual.

My reasoning is, thus, very similar to that of the Florida Supreme Court. To summarize, by giving the power to grant pardons to the Board of Pardons, the Nebraska Constitution granted to the Board of Pardons the power to eliminate legal consequences of convictions and, more specifically, the power to restore felons' right to vote. Because the constitution grants this power to the Board of Pardons, I would find that the separation of powers prohibits the Legislature from exercising the same power in the absence of a constitutional provision expressly directing or permitting the Legislature to do so.

Freudenberg, J., dissenting.

I respectfully dissent from the various majority positions that, collectively, resulted in the granting of a writ of mandamus in this matter. This is the second time in this court's very recent history that it has failed to protect the Nebraska Constitution's separation of powers. Specifically, it is the second time we have permitted the Legislature to create processes that improperly allow other branches of government to exercise the executive branch's exclusive power to pardon. The first instance was this court's decision in *State v. Gnewuch*, 316 Neb. 47, 3 N.W.3d 295 (2024), in which I also dissented. I reaffirm my reasoning stated therein without repeating it here. In that matter, as here, I strongly disagree with the controlling opinions.

In the present matter, the legislative branch, through 2024 Neb. Laws, L.B. 20, requires that convicted felons' constitutionally removed voting rights be automatically returned at the conclusion of their judicially imposed sanctions. The merit of such a policy decision is not a matter entrusted to this court to review, and I do not comment on it. However, it is our duty to ensure compliance with the Nebraska Constitution. The wide range of controlling positions fail to do so.

To properly proceed, we must first examine the relevant constitutional provisions. Neb. Const. art. II, § 1(1), divides the powers of government in Nebraska into the three distinct departments of the legislative, executive, and judicial branches and clearly mandates that "no person or collection of persons being one of these departments shall exercise any power properly belonging to either of the others except as expressly directed or permitted in this Constitution."

Neb. Const. art. IV, § 13, establishes that the power of the pardon rests with the Board of Pardons, consisting of three executive branch members—the Governor, Attorney General, and Secretary of State. The Board of Pardons is granted the power to pardon any "offenses against the laws of the state, except treason and cases of impeachment." *Id*. The same article expressly grants the Legislature the power to pardon a sentence imposed for treason in situations where the Governor has suspended the execution of the sentence and sent the matter to the Legislature to address; however, such situation has no relevance to this analysis except to point out that this is the only provision where either the Legislature or the judiciary is expressly granted the power to pardon in the Nebraska Constitution. Therefore, the legislative and judicial branches are constitutionally precluded from otherwise exercising the power of the pardon.

I disagree with the suggestion in the controlling opinions that the relevant constitutional articles are ambiguous and in need of interpretation through the use of external sources to determine the meaning of the constitutionally established process for the restoration of extinguished voting rights. Further, the term "pardon" is clear and unambiguous and therefore requires no extensive discussion. Black's Law Dictionary 1336 (12th ed. 2024) defines a "pardon" as an act of "officially nullifying punishment or other legal consequences of a crime."

There is no question that the constitutionally mandated loss of the right to vote is a legal consequence of being convicted of crimes under which a person becomes a convicted felon.

Neb. Const. art. VI, § 2, establishes that "[n]o person shall be qualified to vote . . . who has been convicted of treason or felony under the laws of the state or of the United States, unless restored to civil rights." Nullifying the legal consequence of committing a crime by restoring those civil rights is, by definition, a pardon.

Through L.B. 20, the Legislature has usurped the executive branch's exclusive pardoning power by restoring convicted felons' voting rights upon the completion of their judicially imposed sentence. If the Legislature had wished to properly pursue a policy such as that established by L.B. 20, it should have initiated the referendum process to amend article VI of the Nebraska Constitution as other states have done. See, *In re Advisory Opinion of Governor Civil Rights*, 306 So. 2d 520 (Fla. 1975); Fla. Stat. Annot. § 98.0751 (West Cum. Supp. 2024); Fla. Const. art. VI, § 4. The difficulties inherent in such a process do not excuse the Legislature's violation of the separation of powers mandate of the Nebraska Constitution, nor does it excuse the controlling positions, collectively, upholding L.B. 20.

The majority positions include: unnecessarily complex and significantly strained interpretations of historical statutes and cases to impose a flawed analysis to an otherwise unambiguous constitutional process; unsubstantiated allegations of political misconduct upon elected officials of the executive branch for attempting to uphold their oaths to the Nebraska Constitution; and a claim that 1½ months was an insufficient amount of time for the court to consider this matter, and we should, therefore, simply decline to resolve the issue at this time.

The majority positions dangerously allow the Legislature to amend the Nebraska Constitution by legislative act without requiring it to follow the constitutional amendment process. This abuse should not be condoned, let alone sanctioned, by this court. Further, there are no limiting factors contained in any of the majority positions that would prevent the Legislature from passing legislation in the future to restore

convicted felons' voting rights immediately upon conviction, thereby completely negating the existence of Neb. Const. art. VI, § 2.

I unfortunately find myself again dissenting in a case where this court is empowering the Legislature to exercise the pardon power exclusively granted by our constitution to the executive branch. I believe that our duty to protect and preserve the separation of powers mandated by the Nebraska Constitution demands better.